[Cite as *Chasteen v. Dix Road Property Mgt., L.L.C.*, 2021-Ohio-463.]

IN THE COURT OF APPEALS

TWELFTH APPELLATE DISTRICT OF OHIO

BUTLER COUNTY

|  |  |  |
|---|---|---|
| BRADLEY CHASTEEN, | : | |
| Appellee, | : | CASE NOS. CA2020-04-055<br>CA2020-04-056 |
| | : | |
| - vs - | : | O P I N I O N<br>2/22/2021 |
| | : | |
| DIX ROAD PROPERTY MANAGEMENT LLC, | : | |
| Appellant. | : | |

CIVIL APPEAL FROM FAIRFIELD MUNICIPAL COURT
Case No. 2019RE00004

John H. Flessa, 810 Sycamore Street, Cincinnati, Ohio 45202, for appellee

Joseph R. Matejkovic, 9078 Union Centre Boulevard, Suite 350, West Chester, Ohio 45069, for appellant

**BYRNE, J.**

{¶1} Appellant, Dix Road Property Management, LLC ("Dix Road"), appeals from the decision of the Fairfield Municipal Court releasing to appellee, Bradley Chasteen, rent monies he had placed in escrow with the trial court pursuant to R.C. 5321.07. For the following reasons, we affirm.

**I. Procedural History**

{¶2} Chasteen rented a home at 1148 Blackwell Drive in Fairfield, Ohio ("the

Residence") from Dix Road. On September 5, 2019, approximately three weeks after a sewage flood in the Residence's basement, Chasteen filed an application to deposit rent with the clerk in the Fairfield Municipal Court pursuant to R.C. 5321.07. According to the letter attached to Chasteen's application, Chasteen disagreed with Dix Road regarding the adequacy of the sewage flood cleanup. Specifically, Chasteen indicated the Residence was not safe, as "the proper steps were never taken to clean the home," and "the professionals say the home is not safe to live in." Chasteen submitted his September rent payment to the clerk the following day.

{¶3} In fact, Chasteen submitted not only his September rent payment to the clerk, but also his rent payments for October, November, and December 2019 and January 2020. In December, Chasteen provided notice to Dix Road that he was terminating his lease. Chasteen's lease terminated on January 31, 2020.

{¶4} On December 30, 2019, Dix Road filed an application pursuant to R.C. 5321.09 to release the funds that Chasteen had escrowed with the clerk. Dix Road indicated it was entitled to the funds because it had resolved the issues identified by Chasteen in his application.

{¶5} On February 10, 2020, the trial court held a hearing on the matter. Prior to the presentation of its case, Dix Road requested that the trial court dismiss the case and release the money held in escrow to Dix Road. Dix Road argued that Chasteen had failed to document and file with the court evidence demonstrating that he provided Dix Road with the requisite notice under R.C. 5321.07(A) in a timely manner, and therefore, the escrow was improper. The trial court overruled Dix Road's motion and proceeded with the hearing.

{¶6} In March 2020, the trial court issued a judgment entry finding that "the [R]esidence at all times relevant was uninhabitable due to the raw sewage damage" and

releasing the rent escrow funds to Chasteen.  Dix Road appealed.

## II.  Testimony at the Hearing

{¶7}    The court's posthearing judgment entry noted that the court took testimony, received exhibits, and "carefully reviewed the evidence presented at the hearing as well as the applicable authority."  To facilitate our discussion of Dix Road's assignment of error, we will briefly describe the testimony offered at the hearing.[1]

### A.  Testimony Regarding Key Facts

{¶8}    The following key facts were testified to by several witnesses and/or provide background for the testimony described below.

{¶9}    Dix Road, Bed and Breakfast Property Management, and BB Rents are members of a family of companies that manage approximately 1,950 properties, including the Residence.  Beginning in May 2015, Chasteen and his son lived as tenants at the Residence and Dix Road was their landlord.  Beginning in 2016, Chasteen leased the Residence on a month-to-month basis.

{¶10} On August 13, 2019, Chasteen returned home from work to find the Residence's basement had flooded.  Chasteen noticed an "overwhelming" smell of sewage and discovered the Residence's basement carpet was "covered" from the flood and that the basement bedroom had water "all the way up to the bed."  According to Chasteen, the sewage—including fecal matter—was in the shower, on the floors, and "everywhere" in the basement.  It was later determined that the overflow of a drain in the basement caused the flood.

{¶11} After discovering the flooded basement, Chasteen notified Dix Road of the

---

1. Exhibits were also introduced at the hearing, including photographs and other documents that supplemented the testimony described herein.

damage via the landlord's emergency hotline and a plumber was sent to repair the drain the following day. Over the next month, Dix Road worked to remediate the damage caused by the flood, which included steam cleaning the carpet, drying out the basement, replacing the bathroom floor, and replacing some of the drywall and baseboards. Additional repairs were completed over the coming months at Chasteen's request. Efforts were also made to address mold that was found when the drywall was removed.

{¶12} Chasteen insisted that Dix Road must also remove the basement carpet and have the furnace professionally inspected and cleaned due to fecal matter contamination. Dix Road insisted these steps were not necessary and that it had sufficiently addressed the issues caused by the flood. Chasteen and his son, who had moved out of the Residence after the flood intending to return when the repairs were complete, never returned.

### B. Testimony of Tabitha Buell

{¶13} Dix Road's property manager, Tabitha Buell, testified that pursuant to the lease, Chasteen was required to keep all plumbing fixtures clean and free of all foreign materials. The lease further indicated that Dix Road was not liable for any damage, injury, or loss caused by any acts or omissions of the resident. Buell also testified that in February of 2019, all residents, including Chasteen, were sent a notice regarding clogged pipes. That notice reminded residents not to flush any foreign items down the drain, including those labeled as "safe for drains and toilets," and further indicated the resident would be charged for any service calls related to clogged pipes.

{¶14} According to Buell, Chasteen contacted Dix Road about the sewage backup on August 13, 2019. Through conversations related to the sewage backup, Buell learned that because Chasteen believed "the situation had not been taken care of," Chasteen was no longer staying in the Residence, but his personal items remained in the home. Buell

informed Chasteen he could terminate his lease with 30-days' notice, and that "if [he was] out, [Dix Road would] get things cleaned up[.]" However, Chasteen refused and did not terminate his lease until January 2020.

### C. Testimony of Ralph Hammonds

{¶15} Dix Road's operation manager, Ralph Hammonds, testified that he oversaw Dix Road's maintenance department at the time of the flood. He became aware of the sewage backup at the Residence on August 14 or August 15, 2019, when Chasteen informed the maintenance department there had been no cleanup of the sewage in his basement.

{¶16} Hammonds explained various work orders relating to the Residence. According to the first work order, dated August 13, 2019, Dix Road had assigned a drain company to clean the drain at issue, identify why the drain was backing up, and to remediate the cause of the "backup." Hammonds estimated the work was completed within 24 hours of the request. A second work order, dated August 16, 2019, assigned an individual to clean up the sewer "backup," clean the floor, and to dry out the basement. According to Hammonds, the second work order took several days to complete. A third work order, dated August 21, 2019, directed four maintenance techs to remove drywall from part of the basement. Hammonds testified the drywall removal and repair took several days, and that Dix Road would normally have only cleaned the drywall with a bleach solution, but in this case removed the drywall because mold was discovered while conducting drywall removal and repair. The final work order, dated September 27, 2019, assigned additional work related to the basement bathroom, including replacing the tile, rebuilding the existing bathroom cabinets, and general clean up.

{¶17} Hammonds initially testified that, as of the end of August 2019, he believed

Dix Road had finished repairing the pipe and "cleaning up after this mess in the basement," and the home was suitably cleaned and habitable. However, Hammonds later testified he believed the home was not "liveable [sic] again" until late September 2019. Hammonds further stated Dix Road attempted air quality testing in October and subsequently removed additional paneling due to mold. Hammonds admitted that Dix Road finally replaced the basement carpet sometime after Chasteen had moved out of the Residence.

{¶18} Hammonds acknowledged that Chasteen had complaints regarding the cleanup and repairs. He testified Dix Road would "periodically get an e-mail or a text from Mr. Chasteen that mold is still growing or house still smells[.]" Hammonds testified that he and Chasteen disagreed regarding Dix Road's remediation techniques. For example, Chasteen turned the HVAC unit off, believing it would spread fecal contaminants, while Hammonds believed the HVAC unit should remain on in an effort to dry out the home. Dix Road workers turned the HVAC unit back on, despite Chasteen's concerns. Hammonds acknowledged that Chasteen had an air scrubber installed to vent air out of the house. Hammonds also disagreed with Chasteen's assertion that the carpet and padding in the basement were not salvageable, testifying that Dix Road's policy was to simply steam clean the carpet, not to replace the carpet.

### D. Testimony of Steve Metcalf

{¶19} Steve Metcalf testified he specializes in cleaning drains and sewers and has 41 years of experience in drain related work. Metcalf indicated he has done drain and sewer work for Dix Road for five years. Metcalf inspected the Residence's flooded basement at Dix Road's request.

{¶20} Metcalf testified that when he arrived at the Residence, the basement floor was covered with fresh sewage waste, as well as personal hygiene wipes and toilet paper.

In Metcalf's opinion, personal hygiene wipes that were flushed down the toilet contributed to the flooding. Metcalf explained that he did not believe the flood was a result of the heavy rainfall, as a flood from rainwater would be clear, would not have created a clog, and the paper residue would have been black, broken-down toilet paper, not white wipes. Metcalf further testified about his belief that the city of Fairfield has separate sewer systems for septic and for storm water, and therefore, a heavy rainfall would not typically cause flooding like the flood that occurred at the Residence on August 13, 2019.

{¶21} Dix Road did not move to qualify Metcalf as an expert witness. Metcalf testified as a lay witness.

### E. Testimony of Daniel Hand

{¶22} Daniel Hand, the owner of FloodStar Restoration, testified on behalf of Chasteen. Hand indicated he is master certified in water, fire, and smoke restoration by the Institute of Inspection, Restoration, and Cleaning Certifications, and that he has been in the restoration business since 2012. Hand explained that Chasteen called him on August 14, 2019, to assess the situation. After inspecting the Residence, Hand concluded there was sewage backup from the drain in the basement and that several walls needed to come out, as well as the carpet and the sides of the cabinets. Hand installed an air scrubber on the first floor of the Residence in an attempt to clean the air "because nothing was being done." Hand indicated the air scrubber works by taking odors and contaminants out of the house through its vent and processing out clean air, and testified that the air in the home was potentially contaminated by sewage and mold.

{¶23} Hand testified that he located sewage in the Residence's furnace during his inspection. Hand testified that according to restoration industry standards, it would be unsafe to use a furnace contaminated with sewage, and that a contaminated furnace must

be professionally inspected and cleaned before it can be safely operated. If the furnace is not properly cleaned prior to use, there is a risk of cross-contaminating the entire home.

{¶24} Hand also testified regarding the proper standards for water and mold cleanup and indicated that any porous objects that come in contact with sewage, including carpet and carpet padding, must be disposed of, as there is no proper way to clean such objects. According to Hand, any attempt to "halfway clean" any porous items like carpet leaves a health risk to the tenants.

{¶25} Chasteen did not move to qualify Hand as an expert witness. Hand testified as a lay witness.

### F. Testimony of Bradley Chasteen

{¶26} Chasteen testified that it rained a significant amount the night before he discovered the flooding. He believed the heavy rains caused the flood, and he pointed out that two other houses in the neighborhood flooded the same day. Chasteen also noted that while he and his son were away on vacation the week before, Dix Road had completed plumbing repairs in the Residence's bathroom on the main level due to a leak from the bathtub. In light of those repairs, Chasteen and his son had not used the bathrooms for two days before the incident.[2]

{¶27} Chasteen testified to multiple oral and written communications with Dix Road regarding the flood and remediation efforts. After discovering the sewage flood Chasteen began working with Buell, the property manager, who informed Chasteen that Dix Road would not be replacing the carpet. Chasteen also discussed the carpet replacement with

---

2. During his closing argument, Chasteen, who represented himself pro se before the trial court, denied that he or his son used personal hygiene wipes at all. Because this denial was only offered during closing argument, and not during Chasteen's direct testimony or cross examination, we do not consider Chasteen's denial.

the maintenance department, which indicated Dix Road's standard procedure was to steam clean carpets, not remove them. Chasteen disagreed with Dix Road's approach to the carpet. Chasteen hired a specialist, Hand, to "show the sewage was in the carpet" and that the carpet was not safe. Thereafter, Chasteen filed his application to escrow his rent with the trial court and began placing his rent in escrow. According to Chasteen, Dix Road repeatedly indicated "things were fine" and Chasteen informed Dix Road he would continue to escrow his rent until the repairs were done properly. Dix Road did not remove the carpet until after Chasteen moved out.

{¶28} Chasteen noted additional repairs he took issue with, including the cabinet repair. According to Chasteen, the bathroom cabinet was falling apart from being covered in sewage, however Dix Road merely stapled the cabinet back together and reinstalled it in the basement bathroom. Chasteen disagreed with Dix Road's decision to keep the cabinet while removing the drywall when both were affected by sewage.

{¶29} When asked why he continued to pay rent for several months, rather than terminating his lease as Buell suggested, Chasteen indicated he desired to return to the Residence for personal reasons—including its proximity to his son's school—and that he was hoping to move back in. According to Chasteen, Dix Road continued to make "little repairs" over time and the Residence "kept progressively getting better and better." Each time Chasteen sent a "message" to Dix Road, Dix Road would respond that "somebody was coming out." However, by the "end of it," Chasteen remained dissatisfied with the cleanup, as he believed there was "still fecal matter by the furnace." At that point, Dix Road "made it clear that they were done" and refused to do anything about the furnace, and Chasteen elected to terminate his lease and dispose of his remaining personal items in the Residence.

**III. Law and Analysis**

{¶30} Dix Road now appeals the trial court's decision releasing the escrowed rent to Chasteen, raising the following assignment of error for our review:

{¶31} THE TRIAL COURT ERRED TO THE PREJUDICE OF LANDLORD/APPELLANT BY ORDERING THE RELEASE OF TENANT/APPELLEE'S ESCROWED RENT TO TENANT/APPELLEE.[3]

{¶32} In support of this assignment of error Dix Road presents two issues for review. First, Dix Road argues that the trial court erred when it denied Dix Road's verbal motion to dismiss at the beginning of the February 10, 2020 hearing because Chasteen did not provide notice to Dix Road of the basis for his rent escrow application until he filed the application on September 5, 2019, only one day before Chasteen filed his rent in escrow. Second, Dix Road claims the trial court's decision to release the escrowed funds to Chasteen was against the manifest weight of the evidence because the evidence establishes that Chasteen (or his son or a guest) caused the flood by flushing personal sanitary wipes in violation of his lease, and/or because Dix Road completed all necessary remediation work. We will address these arguments in turn.

**A. Timeliness of R.C. 5321.07(A) Notice**

{¶33} R.C. 5321.04 requires that a landlord "make all repairs and do whatever is reasonably necessary to put and keep the premises in a fit and habitable condition." R.C. 5321.04(A)(2). It also requires that a landlord maintain in good and safe working order and condition all electrical, plumbing, sanitary, heating, ventilating, and air conditioning fixtures

---

3. The above-quoted assignment of error is found in the table of contents in Dix Road's brief. The body of the brief stated a different assignment of error: "THE TRIAL COURT ERRED TO THE PREJUDICE OF PLAINTIFF/APPELLANT BY GRANTING JUDGMENT WITH INTEREST AT OTHER THAN THE CONTRACT RATE." Because this assignment of error is not related to the substance of Dix Road's argument, we assume that it was included in the brief in error and that Dix Road's actual assignment of error is the one found in Dix Road's brief's table of contents and quoted above.

and appliances. R.C. 5321.04(A)(4). R.C. 5321.07 provides that, if a landlord fails to fulfill any obligation imposed by R.C. 5321.04, or if the conditions are such that the tenant reasonably believes that the landlord has failed to fulfill such obligations, then the tenant "may give notice in writing to the landlord, specifying the acts, omissions, or code violations that constitute noncompliance." R.C. 5321.07(A).

{¶34} If a tenant who is current with rent payments provides such notice to a landlord and the landlord "fails to remedy the condition within a reasonable time considering the severity of the condition and the time necessary to remedy it, or within thirty days, whichever is sooner," then the tenant may "[d]eposit all rent that is due and thereafter becomes due the landlord with the clerk of the municipal or county court having jurisdiction in the territory in which the residential premises are located." R.C. 5321.07(B)(1).

{¶35} However, a landlord who receives notice of an R.C. 5321.07 rent escrow filed with a municipal or county court "may * * * [a]pply to the court for release of the rent on the ground that the tenant did not comply with the notice requirement of division (A) of section 5321.07 of the Revised Code." R.C. 5321.09(A)(2). Additionally, "[i]f the court finds that there was no violation of any obligation imposed upon the landlord by section 5321.04 of the Revised Code, * * * [or] that the tenant did not comply with the notice requirement of division (A) of section 5321.07 of the Revised Code, * * * the court shall order the release to the landlord of rent on deposit with the clerk, less costs." R.C. 5321.09(C).

{¶36} As previously noted, Dix road moved to dismiss at the commencement of the hearing, arguing that Chasteen failed to provide notice in a timely manner under R.C. 5321.07. The trial court denied the motion. After a review of the record, we find no error in the trial court's denial of Dix Road's motion to dismiss.

{¶37} The grant or denial of a motion to dismiss is within the discretion of the trial

court. *Huge v. Ford Motor Co.,* 155 Ohio App. 3d 730, 2004-Ohio-232, ¶ 7 (8th Dist.). An abuse of discretion connotes more than an error of law or judgment; it implies that the court's attitude is unreasonable, arbitrary, or unconscionable. *Blakemore v. Blakemore*, 5 Ohio St.3d 217, 219 (1983). When applying an abuse of discretion standard, we are not free to merely substitute our judgment for that of the trial court. *Morrison v. Robinson*, 12th Dist. Fayette No. CA2012-06-019, 2013-Ohio-453, ¶ 26, citing *Davis v. Flickinger*, 77 Ohio St.3d 415, 418 (1997).

{¶38} Chasteen attached a letter to his rent escrow application which states, in part: "This letter is to notify you, again that your rent will be in escrow for 1148 Blackwell Drive Fairfield, OH 45014. *I have sent this in an email and expressed it verbally several times.*" (Emphasis added.) The letter details Chasteen's issues with the property, including his concerns about safety and habitability. Chasteen signed the application, certifying under penalty of perjury that the facts included in his application and its attached letter were true.[4] Dix Road has offered no evidence to the contrary.

{¶39} Chasteen's written certification under penalty of perjury of the truth of the letter—which stated that he had previously sent an e-mail to Dix Road about his concerns and his intent to pursue rent escrow—is sufficient evidence from which the trial court could have concluded that Chasteen had provided Dix Road with the written notice referenced by R.C. 5321.07(A). *See CMB Partnership v. Baker*, 2d Dist. Montgomery No. 18159, 2000 Ohio App. LEXIS 2315, * 6-7 (June 2, 2000) (finding a tenant provided the landlord adequate notice pursuant to R.C. 5321.07[A] where the tenant testified she mailed such notice to the landlord and the trial court apparently believed the tenant's testimony).

---

4. Chasteen's letter is consistent with Chasteen's and Hammonds' testimonies at trial, as both testified that Chasteen informed Dix Road of his concerns with the cleanup and overall dissatisfaction with the repairs in writing via e-mail and text messaging.

{¶40} This leaves the question of whether Chasteen provided Dix Road with sufficient time to remedy the condition in the Residence before depositing his rent in escrow. R.C. 5321.07 provides that a tenant may deposit rent in escrow after providing written notice if the landlord "fails to remedy the condition within a reasonable time considering the severity of the condition and the time necessary to remedy it, or within thirty days, whichever is sooner." R.C. 5321.07(B)(1). Chasteen's certified application and its attached letter refer to an earlier written notice—an email—that was provided to Dix Road but does not state the date on which that notice was provided. However, the work orders about which Hammonds testified, and which were created as a result of Chasteen's complaints to Dix Road, evidence that Dix Road was well aware of the flood, the sewage, and Chasteen's complaints as early as August 14, 2019. As a result, Dix Road in fact had approximately three weeks to remedy the damage done by the sewage flood before Chasteen filed his escrow application with the trial court on September 5, 2019 and deposited his rent in escrow the following day. In these circumstances we find such a length of time is reasonable, particularly given the urgent need to clean up sewage and fecal matter. *See, e.g., Stiffler v. Canterbury Runn Apts.*, 2d Dist. Montgomery No. 19308, 2002-Ohio-5382, ¶ 11 (finding the trial court did not err in determining even 14 days was an unreasonably long period of time for a landlord to make its repairs and put the premises in a habitable condition where the apartment was "infiltrated by leaking water, sewage, growing mold, soaked carpets, and a sagging ceiling"). As a result, we find that the trial court did not abuse its discretion in denying Dix Road's motion to dismiss.

{¶41} We pause to note that Dix Road's brief could be read as also arguing that the trial court's posthearing judgment entry implicitly found that Chasteen provided Dix Road with timely notice as required by R.C. 5321.07(A), and that this implicit finding was against

the manifest weight of the evidence. To the extent Dix Road advances such an argument, we disagree for the same reasons stated above with respect to why the trial court did not err in denying Dix Road's motion to dismiss. That is, based on the reasoning set forth above, we find there is competent and credible evidence in the record that Chasteen provided Dix Road with written notice pursuant to R.C. 5321.07(A) and that the remaining requirements of R.C. 5321.07 were met before the trial court released the escrow funds to Chasteen. *See Sterling Constr., Inc. v. Alkire*, 12th Dist. Madison No. CA2016-12-032, 2017-Ohio-7213, ¶ 8 (a judgment will not be reversed as being against the manifest weight of the evidence where it is supported by some competent, credible evidence going to all essential elements of the case). Accordingly, the trial court's implicit finding that Chasteen provided timely written notice under R.C. 5321.07 is not against the manifest weight of the evidence.

### B. Causation and Habitability

{¶42} We now turn to Dix Road's argument that the trial court's decision was against the manifest weight of the evidence. Dix Road claims the evidence presented at trial clearly proves the sewage flood was solely Chasteen's fault, and therefore, Dix Road was entitled to the escrowed rent pursuant to R.C. 5321.09(D). According to that statute, "if the court finds that the condition contained in the notice given pursuant to division (A) of section 5321.07 of the Revised Code was the result of an act or omission of the tenant, * * * the tenant shall be liable for damages caused to the landlord and costs[.]" R.C. 5321.09(D).

{¶43} The standard of review for a manifest weight challenge in a civil case is the same as that applied to a criminal case. *Dunn v. Clark*, 12th Dist. Warren No. CA2015-06-055, 2016-Ohio-641, ¶ 8, citing *Eastley v. Volkman*, 132 Ohio St.3d 328, 2012-Ohio-2179, ¶ 17. In considering a manifest weight challenge, a reviewing court weighs the evidence

and all reasonable inferences, considers the credibility of witnesses and determines whether in resolving conflicts in the evidence, the finder of fact clearly lost its way and created a manifest miscarriage of justice warranting reversal. *Hacker v. House*, 12th Dist. Butler No. CA2014-11-230, 2015-Ohio-4741, ¶ 21, citing *Eastley* at ¶ 20. "[E]very reasonable presumption must be made in favor of the judgment and the finding of facts." *Eastley* at ¶ 21. "If the evidence is susceptible of more than one construction, the reviewing court is bound to give it that interpretation which is consistent with the * * * judgment[.]" *Id.* Moreover, "where the decision in a case turns upon credibility of testimony, and where there exists competent and credible evidence supporting the findings and conclusions of the trial court, deference to such findings and conclusions must be given by the reviewing court." *Myers v. Garson*, 66 Ohio St. 3d 610, 614 (1993), citing *Seasons Coal Co. v. Cleveland*, 10 Ohio St. 3d 77, 80 (1984).

{¶44} Dix Road argues that the trial court's decision is contrary to "all" of the evidence. This is not the case. Dix Road's theory that Chasteen, his son, or a guest caused the flood by flushing personal hygiene wipes down the toilet is supported by Metcalf's testimony that he observed personal hygiene wipes in the sewage when he inspected the basement. But Dix Road offered no evidence or testimony establishing that the personal hygiene wipes were flushed by Chasteen, his son, or one of their guests; Dix Road simply assumed this to be the case.

{¶45} Chasteen offered evidence rebutting Dix Road's theory. Chasteen testified that he and his son had not flushed the toilet for two days before the backup because of unfinished upstairs bathroom repair work that had been performed by Dix Road, and that they had been away from the Residence on vacation for a period of time before the flooding occurred. Chasteen testified that there was heavy rain the night before the flooding in his

basement and that two other houses in his neighborhood experienced flooding the same day. He also testified that Dix Road had completed work on the plumbing in the home shortly before the flood, and that there had never been any flooding before that work was completed.

{¶46} Dix Road relies heavily on Metcalf's opinion testimony regarding his belief that the personal hygiene wipes were flushed by Chasteen, his son, or a guest and that those wipes caused the sewage flood, regarding his belief that rainfall would not cause a sewer to back up into a home given the type of sewer system in place in Fairfield, and regarding the significance of the color of the toilet paper and personal hygiene wipes found in the basement after the flood. In its brief, Dix Road refers to Metcalf as a "sewer-line expert." However, the record reflects that Dix Road offered Metcalf as a lay witness and did not seek to qualify him as an expert witness, nor did the trial court determine that Metcalf was an expert witness. Therefore, Metcalf's testimony is only due the weight appropriate to lay witness testimony. *See* Evid.R. 701 ("If the witness is not testifying as an expert, the witness' testimony in the form of opinions or inferences is limited to those opinions or inferences which are [1] rationally based on the perception of the witness, and [2] helpful to a clear understanding of the witness' testimony or the determination of a fact in issue").

{¶47} The trial court was not obligated to accept Metcalf's lay opinion testimony regarding the cause of the sewage flood or the meaning of the color of the wipes. Nor was the trial court obligated to believe Metcalf's testimony about how Fairfield's sewage system worked, particularly when Metcalf was not an employee of the city. The trial court was free to instead believe Chasteen's testimony that he and his son had not used the basement bathroom recently and that two other houses in the neighborhood flooded after the previous night's heavy rainfall, meaning the rain, not the wipes, caused the flood. *See Myers*, 66

Ohio St. 3d at 614 ("where the decision in a case turns upon credibility of testimony, and where there exists competent and credible evidence supporting the findings and conclusions of the trial court, deference to such findings and conclusions must be given by the reviewing court"). The trial court was in the best position to assess Metcalf, Chasteen, and the other witnesses who testified; to observe their demeanor, gestures, and voice inflections; and to use those observations in weighing the credibility of the testimony of the witnesses. *Myers*, 66 Ohio St. 3d at 615, citing *Seasons Coal Co.*, 10 Ohio St.3d at 80. It is apparent from its decision that the trial court chose to believe Chasteen's testimony and to reject Dix Road's theory of causation. Others may have reached a conclusion different from the one reached by the trial court based on its assessment of the evidence, but we cannot say that the trial court clearly lost its way. *See Hacker*, 2015-Ohio-4741 at ¶ 21, citing *Eastley* at ¶ 20. If, as the trial court implicitly found, Chasteen did not cause the flood, then R.C. 5321.09(D) did not require that the escrowed rent funds be returned to Dix Road.

{¶48} Dix Road also argues that it had repaired everything that needed to be repaired in the Residence after the flood "save some cosmetic finishes," and states that Chasteen did not show a violation of the lease, a building code, or its statutory duties. The Ohio Revised Code provides that "[i]f the court finds that there was no violation of any obligation imposed upon the landlord by section 5321.04 of the Revised Code * * *the court shall order the release to the landlord of rent on deposit with the clerk, less costs." R.C. 5321.09(C).

{¶49} While the record reflects Dix Road began remediating the damage caused by the sewage flood in mid-August, Hammonds testified he did not believe the Residence was habitable until late September, approximately three weeks after Chasteen filed his escrow application. Moreover, despite Hammonds' testimony that the Residence was habitable at

that time, the record reflects Dix Road assigned significant repair work related to the basement's paneling and bathroom as late as October. There is evidence, moreover, that the Residence remained uninhabitable after October. Chasteen testified that sewage was found in the furnace, and yet, Dix Road refused to have the furnace professionally inspected and cleaned during the remainder of Chasteen's lease. Furthermore, while sewage—including fecal matter—was found throughout the basement, and Dix Road removed the bathroom tile, Dix Road refused to replace the carpet, taking the position that steam cleaning was sufficient to remove fecal matter from a carpet's fibers. Dix Road did not replace the carpet until after Chasteen moved out.

{¶50} These facts constitute competent and credible evidence supporting the trial court's finding that the Residence "at all times relevant was uninhabitable due to the raw sewage damage." In such situations we must defer to the trial court as the finder of fact. *See Myers* at 614. Because the trial court found that the Residence was uninhabitable, it implicitly found that Dix Road failed to meet its obligations under R.C. 5321.04(A)(2) ("A landlord who is a party to a rental agreement shall do all of the following * * * (2) Make all repairs and do whatever is reasonably necessary to put and keep the premises in a fit and habitable condition"). Accordingly, we find the trial court's decision to release the escrowed rent funds to Chasteen was not against the manifest weight of the evidence. *See* R.C. 5321.07(B).

{¶51} Finding no merit to any of Dix Road's arguments, we overrule its sole assignment of error.

{¶52} Judgment affirmed.

M. POWELL, P.J., and S. POWELL, J., concur.