[Cite as *Nwankwo v. Uzodinma*, 2022-Ohio-565.]

IN THE COURT OF APPEALS

TWELFTH APPELLATE DISTRICT OF OHIO

BUTLER COUNTY


| | | |
|---|---|---|
| OLUCHI IJEOMA NWANKWO, | : | CASE NO. CA2021-08-098 |
| Appellee, | : | O P I N I O N<br>2/28/2022 |
| | : | |
| - vs - | : | |
| | : | |
| NNAMDI KENFRANCIS UZODINMA, | : | |
| Appellant. | : | |


APPEAL FROM BUTLER COUNTY COURT OF COMMON PLEAS
DOMESTIC RELATIONS DIVISION
Case No. DR20080487


Blake P. Somers LLC, and Jordan M. Feldkamp, for appellee.

Charles H. Bartlett, Jr., for appellant.


**M. POWELL, P.J.**

{¶1} Appellant, Nnamdi Kenfrancis Uzodinma ("Husband"), appeals a decision of the Butler County Court of Common Pleas, Domestic Relations Division, annulling his marriage to appellee, Oluchi Ijeoma Nwankwo ("Wife"), on the ground Wife's consent to the marriage was obtained by fraud.

{¶2} The parties were born in Nigeria and grew up as neighbors there. Wife

immigrated to the United States with her family in her early teens and became a naturalized American citizen. In 2010 or 2011, when the parties were in their mid-twenties, Husband contacted Wife through Facebook. Husband was still living in Nigeria at the time. The parties courted via Facebook and discussed marriage. In 2014, Wife travelled to Nigeria where the parties were married in a traditional Nigerian ceremony. Wife returned to the United States; Husband moved to the United States once he obtained a "fiancé visa." They were legally married on May 3, 2015. Wife added Husband to her cellphone plan and Kemba Credit Union bank account.

{¶3} During the marriage, both parties deposited their paychecks into their joint bank account. Husband was employed by two different companies, AstraZeneca and Americans Choice HealthCare Services ("Americans Choice"). His AstraZeneca paychecks were directly deposited into the bank account whereas Husband physically deposited his Americans Choice paychecks into the bank account.

{¶4} The parties discussed starting a family. Although Husband was affectionate toward Wife and regularly gave her loving cards and notes, the lack of physical intimacy strained the marriage. Husband claimed he was unable to perform due to stress. The parties dispute whether the marriage was "consummated." The parties began the process of In Vitro Fertilization ("IVF") to start a family.

{¶5} In 2019, the parties bought a house. That same year, Husband obtained his green card, paving the way for him to apply for his American citizenship. Husband often spoke of obtaining his American citizenship and began pressing Wife to allow him to apply. Wife wanted Husband to wait as the fee for the citizenship application was $800 and the parties were incurring substantial IVF-related expenses. Nonetheless, Husband applied for his American citizenship without telling Wife.

{¶6} Wife accompanied Husband to his citizenship interview in October 2019.

- 2 -

Husband became a naturalized American citizen on December 6, 2019, and obtained his American passport on December 13, 2019. Once Husband obtained his American citizenship, his behavior changed. While the parties continued discussing having a family and Husband continued to give Wife affectionate cards and texts, "there was a disconnect," Husband became distant, and he no longer wanted to attend IVF appointments.

{¶7} Just prior to applying for citizenship, Husband stopped depositing his Americans Choice paychecks into the parties' joint bank account. Then, his AstraZeneca paychecks stopped being directly deposited into the bank account after February 2020. Husband falsely claimed this was the result of a payroll glitch. Unbeknownst to Wife, Husband opened a personal Chase bank account on June 8, 2020, using a friend's car lot address for the account. Husband subsequently instructed AstraZeneca to directly deposit his paychecks into his Chase bank account.

{¶8} Just prior to June 17, 2020, Husband deleted his Facebook account, purportedly to focus more on the family. Then, on June 17, 2020, two weeks before an IVF appointment to collect his sperm, Husband disappeared and did not take Wife's calls or reply to her texts or emails. Wife filed a missing-person report with police. On July 1, 2020, Wife received a message from Husband, asking her to stop saying he was missing and telling her he needed time and space. In her quest to find Husband between June 17, 2020, and July 1, 2020, Wife began reviewing his emails and internet search history. She discovered that up to ten days before he disappeared, Husband had repeatedly visited escort services sites as well as "Plenty of Fish," an online dating site. Wife also discovered emails between Husband and a Canadian visa expert, that Husband had downloaded an application on June 10, 2020, allowing him to call and text using a phone number other than his, and a "Weekly Pay Report," indicating Husband had been working for Grubhub unbeknownst to her. Wife further found messages between Husband and his younger

brother in which Husband expressed his desire to "find a way out."  Husband never returned to the marital home.

{¶9}    On August, 3, 2020, Wife filed a complaint to annul her marriage to Husband on the ground of fraud.  Specifically, Wife alleged that her consent to the marriage was obtained by fraud because Husband married her only to obtain his American citizenship.  The trial court held a hearing on the motion on January 28, 2021.  Both parties testified.  On March 4, 2021, the trial court found that Wife was entitled to an annulment of the parties' marriage under R.C. 3105.31(D) because Husband had engaged in fraud to obtain Wife's consent to the marriage.  Specifically, the trial court found that Wife's evidence, when considered in its totality, established that

> [Husband] engaged in fraud to obtain his citizenship through his marriage to [Wife].  This affected the marital relations in its essential parts.  [Husband's] behavior toward his wife and their marriage changed shortly and drastically after obtaining his citizenship and passport.
>
> Additionally, [Husband] planned a financial and practical exit, and then left the marriage shortly before he was to engage in his part of the IVF process.  This contradicts his representations that he was excited to start a family with [Wife].
>
> While the facts are consistent with present day life and differ somewhat from the facts in much of Ohio's older case law, the evidence meets the criteria for annulment based on the statute and case law.

In reaching its decision, the trial court found that Wife's testimony was more credible than Husband's testimony.  A judgment entry and decree of annulment was journalized on May 6, 2021.

{¶10}    Husband moved for a new trial pursuant to Civ.R. 59, arguing that he was entitled to a new trial under Civ.R. 59(A)(6) and (7) because there was no direct evidence of fraud and it was not proven by clear and convincing evidence.  Husband further argued he was entitled to a new trial pursuant to Civ.R. 59(A)(1), (2), and (3) because irregularity

- 4 -

in the proceedings, Wife's misconduct, and surprise prevented him from presenting certain evidence. On July 28, 2021, the trial court denied Husband's motion for a new trial.

{¶11} Husband now appeals the trial court's annulment of the marriage and denial of his motion for a new trial, raising two assignments of error.

{¶12} Assignment of Error No. 1:

{¶13} THE TRIAL COURT ERRED IN GRANTING AN ANNULMENT TO THE PLAINTIFF BASED ON FRAUD IN THE INDUCEMENT.

{¶14} Husband argues that the trial court erred in annulling the parties' marriage on the ground of fraud under R.C. 3105.31(D).

{¶15} R.C. 3105.31(D) provides that a marriage may be annulled where "the consent of either party was obtained by fraud, unless such party afterwards, with full knowledge of the facts constituting the fraud, cohabitated with the other as husband or wife[.]"

{¶16} "The elements of fraud are an actual or implicit misrepresentation of material facts made with knowledge that the representation is false or with disregard for its truth or falsity with the intention of misleading the other party into relying upon it, and a reliance by the other party upon the misstated facts with a resulting injury as a consequence[.]" *Slavin v. Slavin*, 8th Dist. Cuyahoga No. 49087, 1985 Ohio App. LEXIS 8237, *10 (June 27, 1985).

{¶17} The parties disagree over the appropriate burden of proof in an annulment case. Husband argues that fraud under R.C. 3105.31(D) must be established by clear and convincing evidence, which is "that measure or degree of proof which is more than a mere 'preponderance of the evidence,' but not to the extent of such certainty as is required 'beyond a reasonable doubt' in criminal cases, and which will produce in the mind of the trier of facts a firm belief or conviction as to the facts sought to be established." *State ex rel. Doner v. Zody*, 130 Ohio St.3d 446, 2011-Ohio-6117, ¶ 54. Wife argues that the burden

of proof in an annulment case is a preponderance of the evidence, which "is defined as that measure of proof that convinces the judge or jury that the existence of the fact sought to be proved is more likely than its nonexistence." *Id.*

{¶18} A party seeking an equitable remedy, such as declaratory judgment, setting aside or reformation of a written document, or reformation or rescission of a contract, must prove a fraud claim with clear and convincing evidence, while a party seeking a monetary remedy must prove fraud by the preponderance of the evidence. *Weiss v. Kearns*, 11 Ohio St.2d 73, 75 (1967); *Lapkovitch v. Rankl & Ries Motorcars, Inc.*, 5th Dist. Stark No. 2021CA00062, 2021-Ohio-4436, ¶ 27. *See also Chester v. Jordan*, 2d Dist. Champaign No. 97 CA 0007, 1998 Ohio App. LEXIS 658 (Feb. 20, 1998) (Generally, to establish a claim of fraud seeking +-money damages, a preponderance of the evidence is sufficient. It is only where fraud is alleged as a basis for equitable relief that the more stringent clear and convincing evidence standard applies). Marriage is a contract, and an annulment under R.C. 3105.31(D) seeks to set aside that contract for fraud.

{¶19} The Tuscarawas County Court of Common Pleas applied a clear-and-convincing-evidence standard in an annulment case for fraud. *Anderson v. Anderson*, 8 Ohio Misc. 97, 1966 Ohio Misc. LEXIS 252 (C.P.1966). Similarly, the Eighth District Court of Appeals applied a clear-and-convincing-evidence standard in upholding a trial court's judgment annulling a marriage for fraud. *Slavin*, 1985 Ohio App. LEXIS 8237 at *14. Other jurisdictions have likewise held that when a spouse seeks to annul a marriage based upon fraud in the inducement, such fraud must be proven by clear and convincing evidence. *See Travis A. v. Vilma B.*, 153 N.Y.S.3d 674, 197 A.D.3d 1401 (2021); *In re Marriage of Goodwin-Mitchell & Mitchell*, 40 Cal.App.5th 232, 253 Cal.Rptr.3d 123 (2019); and *Seirafi-Pour v. Bagherinassab*, 197 P.3d 1097 (Okla.App.2008). We therefore hold that when a marriage is sought to be annulled for fraud under R.C. 3105.31(D), such fraud must be

proven by clear and convincing evidence.

{¶20} Establishing fraudulent intent by direct evidence is difficult as intent to mislead is rarely shown by direct evidence. *TRAX Constr. Co. v. Reminderville*, 11th Dist. Lake Nos. 2020-L-113, 2020-L-127, and 2021-L-008, 2021-Ohio-3481, ¶ 53. "In proving knowing falsity and intent to mislead or deceive, a plaintiff is not necessarily required to present direct evidence, such as a confession by the tortfeasor[.]" *Andrew v. Power Marketing Direct, Inc.*, 10th Dist. Franklin No. 11AP-603, 2012-Ohio-4371, ¶ 50. Rather, a plaintiff may present circumstantial evidence to show intent to defraud. *Id.*; *TRAX Constr. Co.* at ¶ 53. Circumstantial evidence is that which can be "inferred from reasonably and justifiably connected facts." *Hinerman v. Grill on Twenty First, L.L.C.*, 5th Dist. Licking No. 2020 CA 00054, 2021-Ohio-859, ¶ 88. Circumstantial evidence and direct evidence inherently possess the same probative value. *Id.*

{¶21} "'It is a general rule that false representation as to character, health, wealth and external conditions do not constitute such fraud as will annul a marriage contract. In order to be such a fraud it must affect the marital relation in its essential parts.'" *Stepp v. Stepp*, 9th Dist. Medina No. 03CA0052-M, 2004-Ohio-1617, ¶ 4, quoting *Kraus v. Kraus*, 6 Ohio N.P. 248, 9 Ohio Dec. 515 (C.P.1899). "Fraud in inducing a party to enter into marriage is insufficient; the fraud must be in a matter essential to the marriage relation itself or affecting the legality of the union." *Stepp* at ¶ 5. *See also Joy v. Joy*, 12 Ohio Dec. 574, 1900 Ohio Misc. LEXIS 157 (C.P.1900).

{¶22} Several jurisdictions have recognized that an annulment may be had for fraud where a defendant spouse induced the plaintiff spouse to marry with the ulterior objective of entering the United States and obtaining an immigration or citizenship benefit. *See In re Marriage of Liu*, 197 Cal.App.3d 143, 242 Cal.Rptr.649 (1987); *Travis A.*, 153 N.Y.S.3d 674; *Seirafi-Pour*, 197 P.3d 1097; and *Miller v. Miller*, 1998 OK 24, 956 P.2d 887 (1998) (stating

that misrepresentations which have been found to go to the essence of the marital relationship, generally in an action for annulment, include concealment of the fact that one party married the other for the sole purpose of obtaining a "green card" from the Immigration Department).

{¶23} Husband argues that the trial court erred in annulling the parties' marriage for fraud because Wife failed to prove fraudulent intent by clear and convincing evidence. Husband asserts there is ample evidence that his intent was "in fact to have a real marriage" because the parties were romantically involved for three to four years prior to getting married, engaged in a traditional Nigerian ceremony, were legally married in the United States, remained married for five years, purchased a home and lived together, commingled their finances, and participated in IVF to have children. Husband further asserts the marriage failed not because he intended it only as a mechanism to obtain an American citizenship but because Wife was upset the marriage was not consummated and that Husband had borrowed money from relatives and sold the marital car, and because Wife continually threatened him with divorce and deportation and was physically abusive to him during arguments. Husband claims that "[i]t was not until six months after becoming a U.S. citizen that [he] left his wife, and then only after she moved her mother and sister into the marital home, that [he] decided he had had enough."

{¶24} Upon a thorough review of the record, we find that Wife presented clear and convincing evidence that her consent to the marriage was obtained by Husband's fraud.

{¶25} Although the parties grew up as neighbors in Nigeria, the record indicates that they did not stay in touch after Wife immigrated to the United States in her early teens. In 2010 or 2011, when they were in their mid-twenties, Husband first reached out to Wife through Facebook. Husband was living in Nigeria at the time. The parties courted for a few years via Facebook and discussed marriage, a topic which Husband initiated. In 2014, Wife

travelled to Nigeria where the parties were married in a traditional Nigerian ceremony. Wife testified that she would have moved to Nigeria to live with Husband. However, Husband had no desire to live in Nigeria with Wife, "It was get married and move [to the United States]." By contrast, Husband testified it was Wife's idea for the couple to live in the United States and that he wished to remain in Nigeria but ultimately preferred to move his family to the United States. Wife returned to the United States. Husband joined her once he obtained a "fiancé visa." They were legally married in May 2015, within 90 days of Husband entering the United States with his "fiancé visa."

{¶26} Except for the lack of physical intimacy, the parties' marriage proceeded normally until 2019 when Husband obtained his permanent green card, paving the way for him to apply for his American citizenship. Wife testified that Husband's desire to become an American citizen became a topic of conversation in the summer of 2019, that he was the only one who brought it up it, and that his insistence almost became an argument. At the time, Wife believed a green card holder had to wait five years before applying for an American citizenship. She later learned that a green card holder married to an American citizen could obtain an American citizenship after three years.

{¶27} Prior to applying for citizenship, Husband stopped depositing his Americans Choice paychecks into the parties' joint bank account. He then applied for his American citizenship without telling Wife. She learned about the citizenship application when she noticed that $5,000 was missing from their joint bank account and confronted Husband about it. Husband told Wife he used the money to ship a marital car to Nigeria, pay debts he had in Nigeria, and use the balance for the application fee. However, Husband testified he borrowed money from his family to pay for the $800 application fee.

{¶28} After Husband obtained his American citizenship and American passport in December 2019, his behavior changed. Notably, he became distant and no longer desired

to attend IVF appointments, belying his professed love for Wife and desire to have a family. Then, in March 2020, Husband's AstraZeneca paychecks stopped being directly deposited into the parties' joint bank account. Husband falsely claimed this was the result of a payroll glitch. Despite his representation to Wife that he had resolved the "payroll glitch," his AstraZeneca paychecks were still not directly deposited into the joint bank account as of June 2020.

{¶29} In June 2020, Husband actively and secretly prepared his financial and practical exit from the marriage. Specifically, the record shows that Husband opened a personal Chase bank account on June 8, 2020, deleted his Facebook account and visited escort services sites and an online dating website prior to disappearing on June 17, 2020, had his AstraZeneca paycheck directly deposited in his Chase bank account on June 19, 2020, exchanged messages with Canadian visa experts, and finally contacted Wife on July 1, 2020, telling her he needed time and space. Husband never returned to the marital home. Wife testified she found messages between Husband and his younger brother expressing Husband's desire to "find a way out."

{¶30} Husband relies on the fact that after the parties were romantically involved for three or four years before they married, they "stayed married for five years" and were romantically involved during their marriage. Wife testified that Husband was affectionate before and during the marriage. Jurisdictions have recognized that premarital representations of love, affection, and commitment are not enough to warrant an annulment based upon fraud when a marriage breaks down and love and commitment prove unenduring. *See Travis A.*, 153 N.Y.S.3d 674; *Miller*, 956 P.2d 887. However, Husband could not apply for his American citizenship until after he legally married Wife, a naturalized American citizen, and subsequently obtained his green card. In other words, Husband had to remain married to Wife a certain number of years before he could apply for citizenship.

The record plainly shows that once Husband obtained his green card in 2019, things rapidly evolved as Husband secretly applied for his American citizenship that same year, became a naturalized American citizen that same year, subsequently drastically changed his behavior toward Wife and their marriage, and exited the marriage within six months of becoming an American citizen.

{¶31} Even though the parties were married for five years, the marriage was never consummated. Husband's testimony that the IVF team confirmed he was not impotent, in conjunction with his practice of visiting online escort services and dating website, belies his claim he was "unable to perform" sexually. Husband's failure to follow through the IVF process and consummate the marriage provides the necessary context to Husband's conduct described above as reliable evidence that he married Wife to obtain his American citizenship.

{¶32} Therefore, the foregoing circumstantial evidence shows that Husband had an ulterior motive and undisclosed intent for the marriage, namely, to enter the United States with a "fiancé visa," subsequently obtain a green card, and then obtain his American citizenship and American passport. The trial court could reasonably infer from the evidence that Husband intended to exit the marriage as soon as he had obtained his goal and as soon as it was expedient.

{¶33} We recognize that the parties' testimony was at times conflicting. As stated above, the trial court found that Wife's testimony was more credible than Husband's testimony. "[W]here the decision in a case turns upon credibility of testimony, and where there exists competent and credible evidence supporting the findings and conclusions of the trial court, deference to such findings and conclusions must be given by the reviewing court." *Myers v. Garson*, 66 Ohio St.3d 610, 614, 1993-Ohio-9. The trial court was in the best position to assess Wife and Husband, to observe their demeanor, gestures, and voice

inflections, and to use those observations in weighing the credibility of their testimony. *Chasteen v. Dix Road Property Mgt., L.L.C.*, 12th Dist. Butler Nos. CA2020-04-055 and CA2020-04-056, 2021-Ohio-463, ¶ 47.

{¶34} Accordingly, the trial court did not err in annulling the parties' marriage on the ground that Wife's consent to the marriage was obtained by Husband's fraud under R.C. 3105.31(D). "Where fraud is so grievous that it places the injured party in an intolerable relationship, it robs the marital contract of all validity. Equity will not deny relief where a deceitful plan, laid and consummated, inevitably defeats the essential purposes of a marriage." *In re Marriage of Rabie*, 40 Cal.App.3d 917, 922, 115 Cal.Rptr. 594 (1974).

{¶35} Husband's first assignment of error is overruled.

{¶36} Assignment of Error No. 2:

{¶37} THE TRIAL COURT ERRED IN DENYING APPELLANT'S MOTION FOR A NEW TRIAL.

{¶38} Husband moved for a new trial pursuant to Civ.R. 59(A)(1), (2), (3), (6), and (7), which provides:

> "A new trial may be granted to all or any of the parties and on all or part of the issues upon any of the following grounds:
>
> (1) Irregularity in the proceedings of the court, jury, magistrate, or prevailing party, or any order of the court or magistrate, or abuse of discretion, by which an aggrieved party was prevented from having a fair trial;
>
> (2) Misconduct of the jury or prevailing party;
>
> (3) Accident or surprise which ordinary prudence could not have guarded against;
>
> * * *
>
> (6) The judgment is not sustained by the weight of the evidence; however, only one new trial may be granted on the weight of the evidence in the same case;

- 12 -

(7)  The judgment is contrary to law[.]

{¶39}  A motion for a new trial under Civ.R. 59(A)(1), (2), and (3) is reviewed under an abuse-of-discretion standard.  *See Nationwide Agribusiness Ins. Co. v. Heidler*, 12th Dist. Clinton Nos. CA2018-06-003, CA2018-07-004, CA2018-09-012, and CA2018-09-015, 2019-Ohio-4311; *Sheffield v. Estate of Bentley*, 12th Dist. Fayette No. CA2014-12-020, 2015-Ohio-3834; and *Wright v. Suzuki Motor Corp.*, 4th Dist. Meigs Nos. 03CA2 thru 03CA4, 2005-Ohio-3494.  When presented with a Civ.R. 59(A)(6) motion for a new trial, a trial court weighs the evidence and considers the credibility of the witnesses to determine whether the manifest weight of the evidence supports the judgment.  *Koerper v. Szabo*, 10th Dist. Franklin No. 18AP-734, 2019-Ohio-3159, ¶ 35; *Kramer v. Kramer*, 12th Dist. Clermont No. CA87-02-014, 1987 Ohio App. LEXIS 9901, *7 (Dec. 7, 1987).  An appellate court does not directly review whether the judgment was against the manifest weight of the evidence; rather, the appellate court determines whether the trial court abused its discretion in denying or granting the Civ.R. 59(A)(6) motion.  *Koerper* at ¶ 35; *Kramer* at *8.  A motion for a new trial brought under Civ.R. 59(A)(7) is reviewed de novo.  *Nationwide* at ¶72.  De novo review means that this court uses the same standard the trial court should have used.  *Id.* at ¶ 71.

{¶40}  Husband challenges the trial court's denial of his motion for a new trial, presenting two issues for review.  Under his first issue for review, Husband argues that the trial court erred in denying his motion for a new trial under Civ.R. 59(A)(6) and (7).

{¶41}  Husband's motion raised the same claims he now asserts on appeal, to wit, Husband's fraudulent intent was not proven by clear and convincing evidence; the trial court inferred fraudulent intent based upon conduct that was not contemporaneous with the marriage but occurred five years later; no evidence was presented that Husband was faking impotence; no evidence was presented that Husband planned his departure from the start

of the marriage; and Husband had ample reasons to be conflicted about remaining in a physically and verbally abusive marriage. The trial court denied the motion, stating it had observed the witnesses on the stand, considered the evidence, and stated its reasons in its decision.

{¶42} In its decision annulling the parties' marriage, the trial court noted that the parties disputed whether the marriage was consummated and whether Husband was truly unable to perform or was instead driven by motive, that the lack of intimacy placed some strain on the marriage, and that the parties began the process of IVF to attempt to start a family. The trial court stated it would consider this evidence in weighing the parties' credibility. Husband testified that after the parties started the IVF process, medical personnel "confirmed with a force, I am not impotent." Husband's arguments regarding the applicable burden of proof, the lack of evidence, direct or otherwise, regarding his fraudulent intent, and the reasons he did not remain in the marriage are premised upon the same facts set forth in his first assignment of error. For the reasons set forth in our discussion of Husband's first assignment of error, the trial court did not err in denying his motion for a new trial under Civ.R. 59(A)(6) and (7). *See Oberhauser v. Mabe*, 12th Dist. Butler No. CA2008-11-266, 2009-Ohio-3680.

{¶43} Under his second issue for review, Husband argues that the trial court erred in denying his motion for a new trial under Civ.R. 59(A)(1), (2), and (3). Husband asserts that Wife engaged in misconduct when she falsely testified that Husband's AstraZeneca paychecks were last deposited into the parties' joint bank account in February 2020. In an affidavit attached to his motion, Husband states that following a March 2020 clerical error, AstraZeneca mailed paper paychecks to Husband who then deposited them and that Wife was aware. Husband's affidavit includes bank statements from the parties' Kemba joint bank account showing deposits of approximately $1,700 every two weeks in April and May

2020 and a final deposit of $1,685.89 on June 8, 2020.[1] Husband asserts he was surprised by Wife's testimony and was therefore not prepared to present bank statements showing these deposits. Moreover, "the implication that he no longer deposited his checks was not – with ordinary prudence – something he could have anticipated the court as seeing relevant to his intent and guarded against." Husband further asserts that "much to his dismay," his attorney failed to present an audio recording of one of the parties' arguments which would have confirmed Wife's violent and threatening temperament.

{¶44} The trial court denied the motion, finding that

> [Wife] filed a motion to compel [Husband] to produce documents, which was granted. At the time of the final hearing, many of the documents submitted by [Wife] were obtained through subpoena or provided directly by [Wife].

> [Husband] was represented by competent counsel at the final hearing. [Husband] had ample opportunity to present all relevant evidence, and did provide evidence and testimony in support of his position.

{¶45} An irregularity for purposes of Civ.R. 59(A)(1) is "any matter 'as constitutes a departure from the due, orderly and established mode of proceeding therein, where a party, with no fault on his part, has been deprived of some right or benefit otherwise available to him.'" *Thomas v. Bur. of Workers' Comp.*, 2d Dist. Montgomery Nos. 26805 and 26813, 2016-Ohio-7246, ¶ 96. Accident or surprise, to constitute grounds for a new trial under Civ.R. 59(A)(3), "must not arise from the negligence of the aggrieved party or of her counsel." *Gould v. Gould*, 12th Dist. Butler No. CA2004-01-010, 2005-Ohio-416, ¶ 11. "A trial court's decision overruling a motion for a new trial on the ground of accident or surprise is not reversible error unless the moving party shows that she exercised proper diligence in

---

1. The bank statements attached to Husband's affidavit show deposits of approximately $1,700; Husband asserts the deposits were the paper paychecks issued by AstraZeneca after March 2020. We note that the amount of these deposits was smaller by several hundreds of dollars than the amount of most of Husband's directly deposited AstraZeneca paychecks.

the preparation of her case to prevent surprise and that she used all means reasonably available to overcome the effect of the surprise." *Id.*

{¶46} We find that the trial court did not abuse its discretion in denying Husband's motion for a new trial regarding trial counsel's failure to present an audio recording of one of the parties' arguments. Husband testified that Wife continually threatened him with divorce and deportation and that she was physically abusive to him during arguments. When trial counsel failed to present the recording at the end of the hearing, Husband did nothing. "[I]t was clearly incumbent upon defendant to act promptly and claim relief at the earliest opportunity, using every means reasonably available at the time to remedy the effect of the failure of proof. This he utterly failed to do, or try to do." *Kroger v. Ryan*, 83 Ohio St. 299, 306 (1911). Instead of promptly making known his disappointment and surprise, Husband "was content to observe silence, let the [hearing] proceed and take his chances of a favorable verdict upon the evidence as given." *Id.* "[A] new trial will not be granted on the ground of surprise when the party might have been duly informed by the exercise of ordinary diligence, or where it was induced by his own oversight, forgetfulness or neglect, or where the surprised party has failed to observe due diligence in seeking a remedy[.]" *Id.*

{¶47} We further find that the trial court did not abuse its discretion in denying Husband's motion for a new trial regarding Wife's alleged misconduct. Husband acknowledges that the bank statements attached to his motion were available to him before the hearing. The record shows that Husband was served with Wife's first set of interrogatories and request for production of documents in October 2020. In particular, Wife requested that Husband "produce the last 48 months of statements from any financial account identified in your response to Interrogatory 14," that is, Husband's bank account statements from October 2016 to October 2020. Husband's answers to Wife's

- 16 -

interrogatories identified the parties' Kemba joint bank account as one of his financial accounts.  Thus, Wife's discovery request put Husband on notice that she intended to rely, in part, on his failure to deposit his AstraZeneca paychecks after February 2020.  Husband never provided the requested bank account records.  Had he done so, he would have had the opportunity to specifically challenge Wife's testimony.  Instead, Husband simply testified that he did deposit his AstraZeneca paper paychecks into the parties' joint bank account between April and early June 2020 and that "we can go to the bank and verify[.]"  Husband's failure to adequately investigate Wife's fraud claim and exercise proper diligence in the preparation of his case cannot be called "surprise" and does not entitle Husband to a new trial on the grounds of "irregularity in the proceedings" or "misconduct of the prevailing party."

{¶48}  In light of the foregoing, the trial court did not abuse its discretion in denying Husband's motion for a new trial under Civ.R. 59(A)(1), (2), and (3).

{¶49}  Husband's second assignment of error is overruled.

{¶50}  Judgment affirmed.

S. POWELL and HENDRICKSON, JJ., concur.