[Cite as *Total Quality Logistics, L.L.C. v. Alliance Shippers, Inc.*, 2021-Ohio-781.]

IN THE COURT OF APPEALS

TWELFTH APPELLATE DISTRICT OF OHIO

CLERMONT COUNTY

| | | |
|---|---|---|
| TOTAL QUALITY LOGISTICS, LLC., | : | |
| Appellant, | : | CASE NO. CA2020-06-031 |
| | : | O P I N I O N |
| - vs - | | 3/15/2021 |
| | : | |
| ALLIANCE SHIPPERS, INC., et al., | : | |
| Appellees. | : | |

CIVIL APPEAL FROM CLERMONT COUNTY COURT OF COMMON PLEAS
Case No. 2017CVH00524

Frost Brown Todd LLC, Charles B. Galvin, 9277 Centre Pointe Drive, Suite 300, West Chester, Ohio 45069, for appellant

Montgomery Jonson LLP, Linda L. Woeber, 600 Vine Street, Suite 2650, Cincinnati, Ohio 45202, for appellee, Alliance Shippers, Inc.

**HENDRICKSON, J.**

{¶1} Appellant, Total Quality Logistics, LLC ("TQL"), appeals a decision of the Clermont County Court of Common Pleas, granting judgment in favor of appellee, Alliance Shippers, Inc. ("Alliance"), on TQL's claim for tortious interference with a contract. For the reasons detailed below, we reverse the trial court's decision, enter judgment in favor of TQL on its tortious interference with a contract claim, and remand the case for further

proceedings.

## I. Facts and Procedural History

### A. TQL and Alliance

{¶2}   TQL is a freight broker and third-party logistics company headquartered in Clermont County, Ohio.  TQL has offices throughout the United States, including Ohio and Illinois.  As a third-party logistics company, TQL does not own its own trucks or trailers, but facilitates shipments through those means for other carriers.   To that end, TQL offers several transportation services in the freight industry, including highway drive end solutions, refrigerated services, and flatbed services.  While TQL specializes in over-the-road trucking, it also offers transportation services domestically and internationally via planes, trains, and boats.   Although TQL offers several transportation services, a majority of its business focuses on the "spot-freight" market, which is "essentially last-minute freight," and involves last minute or irregular freight shipping as opposed to "contract freight," which is planned and regular.

{¶3}   TQL has a wide range of employees, however, it typically hires new employees either "straight out of school" or with a few years of sales experience.  While TQL does not avoid applicants with prior freight industry experience, it prefers to extensively train its new employees on the specific sales methods developed and employed by TQL. TQL's training is 22 weeks long and includes a two-week classroom course regarding TQL's "sales play book," which focuses on the industry's "lingo" and teaches the trainees about the "world of freight."  The trainees are then paired with an established logistics account executive who assists the trainee with talking to truck drivers, navigating TQL's system, and learning TQL's "proprietary" software.  Beginning in week seven, the TQL managers introduce the trainees to TQL's processes for sales and prospecting and officially begin sales training around weeks 11 and 12.  For the remaining weeks, the trainees meet with

their assigned logistics account executive, attend coaching session with their managers, and begin "prospecting." According to TQL, it "pour[s] a ton of training and investment during the first 22 weeks."

{¶4} Alliance is another company in the brokerage industry, which is headquartered in New Jersey and has an office near Chicago, Illinois. Alliance also offers several transportation services, including international services, refrigerated trailers, and a highway group. Although Alliance engages in several aspects of the transportation industry, approximately 70 percent of Alliance's business stems from intermodal marketing, i.e., the transportation of full truckloads by railroad. In 2015, Alliance created the Alliance Critical Capacity group ("ACC") in an attempt to "fill a void" in the spot-freight market that Alliance's existing highway group was incapable of filling. Specifically, the ACC division was created to primarily focus in the spot-freight market and to service customers who have loads or shipments that do not fit in Alliance's traditional intermodal or highway group model. The ACC division accounts for approximately eight percent of Alliance's total revenue and primarily services long-time customers of Alliance. Despite its focus on long-time customers, ACC also enables Alliance to penetrate the market via new business and opportunities Alliance traditionally could not service. Approximately 70 percent of ACC's business stems from Alliance's existing customers. Thus, Alliance estimates two and one-half percent of its total operation is seeking new business for ACC.

{¶5} Unlike TQL, Alliance targets experienced candidates with sales and transportation industry experience when recruiting for its ACC division. With regard to its ACC division specifically, Alliance targets candidates who have the "right skills and knowledge of the market to grow that group," as Alliance has little experience in the spot-freight market. Thus, at the time this case commenced, Alliance was looking for employees that knew how to "run the product."

## B. Ryan Schaap's Employment at TQL

{¶6} This appeal concerns Alliance's employment of a former TQL employee, Ryan Schaap. In January 2016, Schaap applied for employment at TQL as a broker in its Chicago office. Prior to joining TQL, Schaap had no experience in freight brokerage or third-party logistics. Instead, before joining TQL, Schaap taught English to students in Japan for approximately 10 years. After a few interviews with TQL personnel, TQL extended an offer of employment to Schaap on February 3, 2016. TQL's employment offer was contingent upon several requirements, including that Schaap would agree to sign a noncompete, nondisclosure and arbitration agreement. Thereafter, Schaap accepted TQL's offer and began orientation at TQL on February 29, 2016. At orientation, Schaap signed a document titled: Employee Noncompete, Confidentiality, and Non-Solicitation Agreement ("NCA"), agreeing to be bound by its terms. In relevant part, the NCA stated the following:

> Employee agrees that, during the course of his * * * employment * * * and for a period of one (1) year after termination or cessation of Employee's employment for any reason:
>
> (i) Employee will not, directly or indirectly, * * * be employed by * * * any Competing Business[;] and
>
> (ii) Employee will not directly or indirectly, either as an employee, agent, consultant, contractor, officer, owner, or in any other capacity or manner whatsoever, * * * participate in any transportation-intermediary business that provides services anywhere in the Continental United States, including but not limited to any person or organization that provides shipping, third-party logistics, freight brokerage, truck brokerage, or supply-chain management services; and
>
> (iii) Employee will not, directly or indirectly, use or solicit any Customer, * * * or take any action, to divert business from TQL.

Thus, the NCA has two provisions relevant to this appeal: (1) The noncompete provision found in covenants (i) and (ii); and (2) the nonsolicitation provision found in covenant (iii).

The NCA further indicates its terms are to be interpreted and enforced exclusively under the laws of Ohio, and that any action arising out of the NCA shall be brought in the Clermont County Court of Common Pleas or in the United States District Court for the Northern District of Illinois.

{¶7}   Notably, although TQL is headquartered in Cincinnati, Ohio, and Schaap maintained a work telephone number with a Cincinnati area code, the entirety of Schaap's employment with TQL took place in Illinois.

## C.  Alliance's Recruitment of Schaap

{¶8}   While employed at TQL, Schaap posted his resume online indicating he was seeking a new opportunity. In February 2017, a recruiter from Alliance, Leah Larson, discovered Schaap's resume and contacted him via e-mail regarding an employment opportunity with Alliance's ACC division.  Approximately one week later, Schaap responded to Larson that he was interested in "hearing more" about the opportunity with ACC, but noted that his "one-year-noncompete clause that [he] signed with [his] current company * * * may restrict [him] from taking certain positions with [Alliance]."  Larson informed Schaap that "typically" such noncompete agreements are not a barrier for Alliance.

{¶9}   Over the next few weeks, Larson continued her recruitment of Schaap to Alliance through e-mail, phone calls, and in-person interviews.  As a part of the recruitment process, Larson asked Schaap to prepare a business plan for review by herself and her superior, Michael Kaplan.  The business plan was to include, in part: (1) a list of accounts targeting and timelines (including any current customers Schaap would feel comfortable targeting right away); (2) the approximate weekly yield those accounts would bring; (3) the next steps in seeking new business.  In response, Schaap prepared a business plan for Larson and Kaplan, which identified six of his current customers at TQL and their weekly yields.  The plan further described Schaap's intent to add 400 companies to Alliance's

system that he knew had freight and used brokers, and that he would be "bringing a list of over 10,000 companies of varying size" that have confirmed freight and use outside carriers on a regular basis. According to the business plan, Schaap intended to identify and add such companies within the first month of his employment at Alliance.

{¶10} Shortly after submitting his proposed business plan, Schaap forwarded Larson a copy of another TQL employee's noncompete agreement with TQL. That agreement was also titled "Employee Noncompete, Confidentiality and Non-Solicitation Agreement". Larson forwarded that agreement to Kaplan, the vice president of the ACC division; however, neither Larson nor Kaplan read the agreement's terms.

### D.  Schaap's Employment at Alliance

{¶11} Ultimately, Alliance extended Schaap an offer of employment as a Sales Representative with responsibilities that included "successfully sell[ing] and win[ning] new customer business in [Alliance's] portfolio of services." Schaap accepted Alliance's offer and began working in the ACC division on April 4, 2017, the day after resigning from TQL for "another job opportunity." Like his employment for TQL, the entirety of Schaap's employment with Alliance occurred in Illinois.

{¶12} Around the same time, in March 2017, Larson began recruiting another former employee of TQL, James Rehak, for the ACC division. Kaplan described Rehak as an experienced broker from TQL, who, "[like Schaap], had a "strong book of business" that he "should have no delays in bringing * * * to Alliance." Rehak accepted an offer of employment with ACC shortly after his initial contact with Larson, and began working for Alliance on April 4, 2017, the same day as Schaap.

{¶13} While employed at TQL, Schaap brokered deals and moved loads for JLE Hospitality, LLC ("JLE") and Country Feed Supply, LLC ("CFS"). Shortly after being hired at Alliance, Schaap brokered deals for these very same TQL customers. Notably, Schaap

moved a load for JLE on behalf of TQL ten days before starting at Alliance and moved another load for JLE on behalf of Alliance approximately one month later. In total, Schaap brokered ten deals for JLE and CFS while employed at Alliance.

### E. The Complaint Against Brandon Martain

{¶14} On May 3, 2017, TQL filed a complaint in the Clermont County Court of Common Pleas alleging that one of its former employees, Brandon Martain, had breached certain nonsolicitation, noncompetition, and nondisclosure covenants owed to TQL. The complaint asserted claims for breach of contract and misappropriation of trade secrets against Martain and a tortious interference with a contract claim against Alliance.

{¶15} Martain worked at TQL from January 2015 until November 2016. Like Schaap, Martain was recruited by Larson to work at Alliance as a sales representative in its ACC division while he was still employed at TQL. During Martain's recruitment process, he disclosed to Larson that he had a noncompete agreement with TQL, which prohibited him from soliciting or pursuing any customers he worked with while employed at TQL. He indicated the noncompete agreement prohibited such acts for a period of one year. Ultimately, Alliance extended Martain an employment offer, which he accepted, and he began working for Alliance on February 6, 2017. Subsequently, around May 15, 2017, Alliance terminated Martain due, in part, to the litigation with TQL, as well as his performance over the prior 90 days.

{¶16} Shortly after Martain's termination, around May 20, 2017, TQL learned of Schaap's employment with Alliance. At that point, TQL contacted Alliance's general counsel, Ronald Horowitz, regarding Schaap's employment at Alliance and informed Alliance that Schaap is "subject to a noncompete agreement substantially similar to Mr. Martain's." In response, Horowitz stated he could not confirm Schaap's employment with Alliance and that he "ha[d] never heard of the guy."

**F. TQL Adds Schaap as a Defendant**

{¶17} In June 2017, TQL moved to amend its original complaint against Alliance and Martain to add Schaap as a defendant. TQL sought to allege the same claims against Schaap and Alliance due to Alliance's employment of Schaap. The trial court granted TQL's motion, and TQL filed its amended complaint on June 23, 2017.

{¶18} TQL also moved for a temporary restraining order and preliminary injunction against Schaap, which the trial court granted on June 23, 2017. In so doing, the trial court ordered Schaap to comply with the covenants of his NCA. The trial court's order indicated its provisions were to remain in effect until July 7, 2017. Despite the trial court's order, Schaap remained employed at Alliance and brokered another deal for JLE on June 30, 2017.

{¶19} Shortly thereafter, on July 10, 2017, Kaplan instructed Schaap, via e-mail, to focus his solicitation efforts on "new business opportunities to utilize Alliance's portfolio services." Kaplan further advised Schaap that he was "not to solicit customers of [his] previous employer, TQL." Schaap did not broker any additional loads for JLE or CFS after receiving Kaplan's instructions.

{¶20} On July 24, 2017, Schaap removed the case to the United States District Court for the Southern District of Ohio. In March 2018, the United States District Court for the Southern District of Ohio remanded the case to the trial court because complete diversity between the parties did not exist.

{¶21} In August 2019, after all parties completed extensive discovery, Alliance, Schaap, and TQL filed competing motions for summary judgment. Shortly thereafter, in September 2019, TQL voluntarily dismissed all claims against Martain, with prejudice.

**F. The Bench Trial and Judgment Rendered in Favor of Alliance**

{¶22} In October 2019, the trial court denied each party's motion for summary

judgment, and the matter proceeded to trial. On October 7, 2019, a four-day bench trial commenced. TQL presented testimony from Michael Rice, Robert Hecht, Bryan Heck, and Mark Bostwick. In lieu of testifying at trial, portions of Larson's deposition testimony were read into the record. At the close of TQL's case in chief, TQL moved the trial court for judgment on the pleadings and the defendants jointly moved for a dismissal of TQL's claims pursuant to Civ.R. 41(B)(2). The trial court denied both motions. Alliance then presented testimony from Larry Henry, the Vice President of Logistics and Special Projects at Alliance, and Kaplan. Schaap testified on his own behalf.

{¶23} After trial, TQL and Alliance (jointly with Schaap), filed proposed findings of fact and conclusions of law. In January 2020, the trial court issued Findings of Fact and Conclusions of Law, as well as a detailed judgment entry. Ultimately, the trial court granted judgment in favor of TQL on its breach of contract claim against Schaap, judgment in favor of Schaap on TQL's claim for misappropriation of trade secrets, and judgment in favor of Alliance on TQL's claim for tortious interference with a contract.

{¶24} With regard to TQL's claim for tortious interference with a contract against Alliance, the trial court found that, given the overbroad definitions of "Competing Business" and "Customer" utilized by TQL in the NCA, Alliance had a good faith basis for believing that the NCA was unenforceable. The trial court also found there is "little doubt that if current Illinois law applies, the NCA is not enforceable due to a lack of consideration." Thus, because the entirety of Schaap's employment with both TQL and Alliance occurred in Illinois, the trial court concluded Alliance had a good faith basis to believe that Illinois law applies and the NCA is unenforceable. As a result, the trial court found that because Alliance had a good faith basis for believing the NCA was not enforceable, TQL had failed to prove the lack of justification required for a tortious interference with a contract claim.

{¶25} The trial court further found TQL was entitled to a permanent injunction

against Schaap, prohibiting him from violating the terms of his NCA with TQL for the period of one year. As a result, the trial court ordered Alliance to terminate Schaap, as Alliance is a competing business of TQL, and further ordered that Schaap shall not violate the terms of his NCA with TQL for a period of one year.

## II. The Appeal

{¶26} TQL now appeals, raising the following assignment of error for our review:

{¶27} THE TRIAL COURT ERRED IN FINDING THAT ALLIANCE SHIPPERS, INC. DID NOT TORTIOUSLY INTERFERE WITH TOTAL QUALITY LOGISTICS, LLC'S CONTRACT WITH RYAN SCHAAP.

{¶28} On appeal, TQL only challenges the trial court's decision to award judgment in Alliance's favor on TQL's claim that Alliance tortiously interfered with the Schaap NCA. Specifically, TQL argues the trial court failed to analyze the factors required by Ohio law as set forth in *Fred Siegel Co., L.P.A. v. Arter & Hadden*, 85 Ohio St.3d 171 (1999), before finding that Alliance's intentional interference with the Schaap NCA was justified and not improper. TQL also claims the trial court misapplied the law to the facts in the underlying record and that the trial court's conclusion that Alliance had a good faith basis to believe the Schaap NCA was unenforceable contradicts its factual findings.

{¶29} The parties presented a significant amount of testimony and exhibits regarding TQL's claims against Schaap and Alliance. The following is only a summation of the testimony related to TQL's claim against Alliance for tortiously interfering with Schaap's NCA.

## A. Testimony Presented at Trial

### i. Larry Henry's Testimony

{¶30} Henry testified that he is the Vice President of Logistics and Special Projects at Alliance and has worked for Alliance for 29 years. Henry indicated Alliance has

approximately 490 employees and had been in business for 42 years at the time of trial. Henry further testified Alliance primarily works with long-time customers, however, the ACC division allows Alliance to grow its business and penetrate new markets. Henry stated he was of the opinion there is very little overlap between Alliance's business and TQL's business.

{¶31} Henry also testified that Alliance requires its employees to sign a noncompete agreement. Henry indicated Alliance's noncompete agreement prohibits employees from soliciting Alliance's customers for two years following the termination of their employment with Alliance. In fact, Schaap signed such a noncompete agreement upon starting his employment with Alliance. The specific noncompete agreement that Schaap signed contained the following language:

> "Employee[] agrees that in the event of termination of his * * * employment, Employee will not, for a period of two (2) years from the date of such termination of employment * * * :
>
> (a) Directly or indirectly * * * sell or service at any place or to any customer whom Employee may have at any time, for Employer and its behalf had any dealings with, for the operation of freight transportation including * * * brokering, intermodal and third party logistics[.]
>
> (b) Solicit or influence business or patronage for the sale and delivery of any of the aforesaid services, products or classes of service or merchandise sold or distributed by Employer from any customer, person, partnership, association, corporation, or other firm or entity whom Employee may have at any time, for Employer and its behalf had any dealings with[.]"

{¶32} The noncompete agreement indicates the agreement is governed by the laws of New Jersey, and identifies Alliance's general counsel, Ronald Horowitz, as the contact person for Alliance.

{¶33} Henry further testified that if Alliance learns during the interview process that a candidate has signed a noncompete agreement with his current or former company,

Alliance will "make [its] best efforts to honor those terms and conditions." According to Henry, he was aware of noncompete agreements which restrict an employee's actions geographically, as well as for a certain period of time. Further, Henry indicated Alliance's "general path of enforcing" a prospective employee's noncompete agreement occurs during the initial communications with the candidate during the interview process, when Alliance reminds the prospects not to violate the terms of their noncompete agreement upon joining Alliance. According to Henry, Kaplan would have been the person responsible for enforcing Schaap's NCA with TQL.

### ii. Michael Kaplan's Testimony

{¶34} Kaplan testified that he has worked for Alliance for ten years and that, in his position as the vice president of the ACC division, he oversees a group of 30 employees and manages the sales effort and operations for the group.

{¶35} Kaplan testified that in general, a recruiter's role is to identify talent, not to determine whether a candidate should be hired or whether employment with Alliance would interfere with a candidate's restrictive covenants or noncompete agreement. Rather, a senior executive and counsel will give "that direction." According to Kaplan, Alliance typically sees noncompete agreements in a "nonsolicitation category," at which point Alliance would be able to work with a senior executive and counsel to manage within that agreement. In his experience at Alliance, Kaplan indicated a "high" percentage of noncompete agreements prohibit working in the transportation industry after leaving a similar company, and an even higher amount pose restrictions via nonsolicitation clauses.

{¶36} Kaplan further clarified that, if Alliance becomes aware that a candidate has a noncompete agreement, it is not until Alliance decides to move forward with that candidate that he would seek guidance from legal counsel regarding the candidate's noncompete situation. According to Kaplan, Alliance had never been sued for interfering with an

employee's noncompete agreement before and Alliance does not prohibit its former employees from working for other companies in the logistics field.

{¶37} Kaplan also testified that at the time Larson was recruiting Martain in January 2017, Kaplan was familiar with TQL. Kaplan was also generally aware, through Alliance's hiring of former TQL employees, that TQL utilized noncompete agreements. With regards to Martain, Kaplan testified Larson would have informed Kaplan that Martain had a noncompete agreement with TQL, which effectively prohibited Martain from soliciting customers he worked with while at TQL for one year. With regard to enforcing Martain's noncompete agreement with TQL, Kaplan indicated that, "through the direction of counsel [Horowitz] the noncompete was not the issue. It's not solicitation of the accounts he worked with at TQL that we - - what we needed to be concerned about."

{¶38} Kaplan also discussed Martain's termination from Alliance. Specifically, Kaplan indicated that Martain was underperforming from Alliance's perspective, which, when coupled with Martain's apparent nondisclosure regarding the lawsuit TQL initiated against him, Alliance "chose to part ways." According to Kaplan, Martain was not generating business for Alliance.

{¶39} Kaplan also testified regarding his knowledge of Schaap's recruitment to Alliance. According to Kaplan, Schaap initially spoke with Larson, followed by a phone call and in-person meeting with Kaplan at Alliance's office near Chicago. During the interview process, Kaplan learned that Schaap, like Martain, had a restrictive agreement with TQL. At that time, Schaap had specifically noted to Larson and Kaplan that he had a noncompete and a nonsolicitation "type of agreement."

{¶40} Kaplan testified he believed Alliance had informed Schaap not to solicit former customers from TQL by the time Martain was terminated from Alliance in May 2017. Specifically, Kaplan believed Larson had indicated that Schaap was not comfortable with

pursuing his customers from TQL and that "[Alliance] agreed with that." According to Kaplan, although he described Rehak in an e-mail to his superior as an experienced broker from TQL, who, "[like Schaap], had a "strong book of business" that he "should have no delays in bringing * * * to Alliance," it was not Alliance's interest for Schaap to bring his accounts from TQL to Alliance. Kaplan clarified that the comments regarding Rehak were simply a summary to an executive to get approval to hire Rehak. In addition to a "strong book of business," Kaplan believed Schaap had a strong business ethic, a strong understanding of the transportation business and "that he would have the potential of potential customers [sic] at this point;" however, those attributes were not as "important" to include in the e-mail summary to the executive.

{¶41} As noted above, Kaplan received a proposed business plan from Schaap in March 2017. The business plan identified six TQL customers and their weekly yields. According to Kaplan, Alliance never "did anything" with the information Schaap provided in his business plan. Instead, the point of the business plan was to ensure that the candidate, Schaap, could develop and design a business plan.

{¶42} Kaplan indicated he was advised by counsel that the nonsolicitation portion of the NCA should be honored by Schaap. Thus, Kaplan indicated Alliance "took [the] information" within Schaap's business plan as "an option as far as what [Schaap's] experience is." Although Kaplan indicated he was unaware that the six customers identified by Schaap were TQL customers, he admitted he knew Schaap had not brokered freight anywhere besides TQL and that he did not believe Schaap could have brought the customers to Alliance from anywhere but TQL.

{¶43} Schaap's business plan further indicated he intended to add 400 companies, 100 companies per week, to Alliance's system that he knew had freight and used brokers. Kaplan testified he believed Schaap obtained a portion of such knowledge from TQL.

Schaap's business plan also stated he would bring a list of over "10,000 companies of varying size that have confirmed freight in these outside carriers on a very regular basis." Kaplan indicated Schaap's statement was appealing to Alliance, and he believed Schaap learned of the 10,000 companies from a wide variety of sources, including his previous employment at TQL.

{¶44} Kaplan also testified regarding his receipt of a standard TQL noncompete agreement during Schaap's recruitment process. As noted above, Schaap sent Larson a copy of another TQL employee's noncompete agreement, which she forwarded to Kaplan. The agreement Schaap sent, although not a copy of his own NCA, contained nearly identical nonsolicitation and noncompetition covenants to those within his NCA. At trial, Kaplan indicated he received a copy of the noncompete agreement around the same time he received Schaap's proposed business plan. Despite receiving a copy of TQL's standard noncompete agreement, Kaplan testified he did not read the agreement, but forwarded it to Alliance's Executive Vice President and Alliance's "guidance counselor," Horowitz. According to Kaplan, he did not actually read the agreement because it was not "relevant." Specifically, the agreement was not Schaap's and Kaplan indicated he was not "going to make an interpretation of somebody else's agreement." Instead, Kaplan believed that was counsel's role. Kaplan testified the first time he saw the NCA Schaap signed was after this case was initiated in June 2017.

{¶45} Kaplan further testified that, although he received a copy of a TQL noncompete agreement, he did not instruct Schaap not to solicit his former customers from TQL at that time. In fact, Kaplan did not provide Schaap with such an instruction until July 2017, approximately three months after Schaap began working at Alliance. Kaplan indicated Schaap had not contacted former TQL customers since Kaplan instructed him not to do so.

{¶46} Around May 20, 2017, Kaplan had a conversation with Schaap regarding TQL's discovery that Schaap was working for Alliance, a competitor of TQL's. In an e-mail to Kaplan and Larson, Schaap indicated he wished TQL did not know he was working for Alliance, but he was "kind of" expecting TQL would eventually find out. According to the e-mail, Schaap was not worried that TQL had discovered his employment with Alliance, as he had "pretty much steered clear of any of the customers [he] had worked with at TQL." Additionally, although Schaap indicated he had "just ran three loads with two of [his] smallest customers, [CFS and JLE]," both CFS and JLE "said they would never let TQL know that [he] ran those loads with them."

{¶47} Kaplan testified he did not know Schaap had moved loads for his former TQL customers before the May 20, 2017 e-mail. According to Kaplan, he did not instruct Schaap to cease such activity until July 2017, over one month later, as he believed Schaap was no longer targeting TQL customers after the May 20, 2017 e-mail. This belief was incorrect, as Kaplan testified Schaap continued to engage in business with JLE after the e-mail, and Alliance's records indicated Schaap brokered seven additional loads for JLE between May 20 and June 30, 2017.

{¶48} Kaplan testified that by May 20, 2017 he was aware Martain had been sued regarding his noncompete agreement with TQL; that TQL's noncompete agreement prohibited former employees from soliciting TQL's customers for a period of one year; and knew that Alliance requires its employees to sign a noncompete agreement with similar prohibitions. When asked why Kaplan waited until July 2017 to instruct Schaap not to solicit his former TQL customers, Kaplan indicated he received guidance from Alliance's legal counsel on how to handle the situation, and he followed that guidance. Kaplan further testified that, although he had received guidance regarding the lawsuit pending against Martain, he was waiting to receive direction as it related to Schaap's situation specifically.

### iii. Leah Larson's Testimony

{¶49} As noted above, Larson was unavailable to testify at trial. As a result, portions of her deposition testimony were read into the record at trial.

{¶50} At her deposition, Larson testified that she had worked for Alliance for 11 years and began "recruiting, hiring, and system implementation for ACC" in 2015. In that role, Larson reported to Kaplan. According to Larson, recruiting is "really difficult these days." She further indicated the "first thing [Alliance] look[s] for" is sale experience, followed by transportation industry experience. Thus, candidates fresh out of college without a prior job history is not someone in whom Alliance would be interested.

{¶51} Larson testified that in November 2016, a few months prior to recruiting Schaap, she recruited another TQL employee for ACC. That employee, Martain, also worked at TQL as a broker when he was contacted by Larson. In January 2017, after having a few discussions with Martain, Larson asked Martain to "describe [his] noncompete situation," as she was aware that he worked at TQL. According to Larson, by January 2017 she was generally aware that TQL employees had noncompete agreements. Larson indicated she asked Martain about his noncompete situation because she wanted to know that he was "competent" with his work ethic, organization skills, and communication skills. Larson further testified that if the candidate can bring customers to Alliance, it would be "nice if their abilities allow them to," but that at the early stages of recruiting, whether the candidate can bring their customers is not something she particularly looks for.

{¶52} At that time, Martain informed Larson that his noncompete with TQL stated he could not pursue or solicit any customers he worked with while at TQL for one year. Larson testified she understood Martain's noncompete prohibited him from "go[ing] after his current customers." On January 23, 2017, Alliance extended an offer to Martain to work in its ACC division. At that point, Larson believed no one at Alliance had requested a copy of

Martain's noncompete agreement, as she was the person responsible for talking to the candidates throughout the recruitment process, and she was not instructed to obtain any noncompete agreements, even if the employee indicated he had one.

{¶53} During the recruitment process, Larson asked Martain to create a business plan which he intended to implement after completing the six-month training period. According to Larson, she asked candidates to prepare such business plans to ensure the candidate has a plan before coming to Alliance, that the candidate has experience, and to demonstrate where the candidate is going to invest his time. With regard to bringing over or servicing customers candidates have a pre-existing relationship with, Larson indicated "if they are not comfortable, then that's fine with us."

{¶54} Larson then turned to her recruitment of Schaap. Larson testified that in his initial communication regarding the opportunity at Alliance, Schaap indicated he loves working in the logistics field, but noted that he has a one-year noncompete clause with his current company, which may restrict him from taking certain positions with Alliance. Larson responded that typically, noncompete agreements are not a "barrier" for Alliance. At her deposition, Larson indicated she meant a noncompete agreement is not a barrier for a discussion in the recruitment process. She further indicated that, in her role, it is not her job to decide whether a noncompete agreement would preclude Alliance from hiring Schaap. Instead, Larson would inform Kaplan of the agreement, who would "get with" his superior to approve the hiring and salary expectations.

{¶55} Beginning on March 6, 2017, after Schaap and Larson had a more detailed conversation regarding the role, the two engaged in a conversation via e-mail regarding Schaap's interest in the role, and both parties' expectations going forward. The chain of e-mails was admitted at trial as an exhibit. In the first e-mail, sent by Schaap to Larson on March 6, Schaap stated the role with Alliance "sounds like a great opportunity to do the

same kind of work that [he] love[s] doing now." However, Schaap further informed Larson that he had certain salary expectations that Alliance would need to offer in order for him to consider a "switch of companies." Larson testified the base salary requested by Schaap was higher than what Alliance typically pays. Larson responded to Schaap that "the salary is negotiable, and that is based on your capabilities and the contribution that you would bring to [Alliance.]" According to Larson, she meant the capabilities and "basically, like, as far as contribution, is he - - like, his skills really; is he a competent person; do people like working with him; is he organized, communication you know, is he going to contribute as a good employee with a good work ethic to [Alliance.]" Larson further indicated contribution could also include Schaap's financial contribution to Alliance.

{¶56} Larson's e-mail continued, and indicated, "I believe you stated that due to your noncompete situation you wouldn't be comfortable bringing your current customers until that time frame has passed, and we understand and respect that decision." At that point, Larson asked Schaap how he planned to grow his business within the one-year time period. According to Larson, it was Alliance's intention not to push Schaap into doing "something" he was not comfortable with, but wanted to know his plan to grow his business while subject to the NCA.

{¶57} On March 9, Schaap responded to Larson that it was "good to know that [his] base salary wouldn't be out of the question. While [he] was slightly worried about the challenges [his] noncompete might bring, [he did] know that asking for such a base salary would mean that [he] should bring [his] current customers with [him] to add value to what [he] bring[s] to the table besides just experience." At her deposition, Larson could not recall whether she thought "anything" about Schaap's plan to bring customers over.

{¶58} Thereafter, Schaap and Larson discussed Schaap's financial performance at TQL, and Larson specifically asked how much Schaap's business brings in margin per

week. Larson also asked Schaap to prepare a business plan, including a list of accounts he intended to target, including "any current customers that [he felt] comfortable targeting right away," as well as "any other accounts or markets" Schaap planned to target initially; the weekly yield those accounts would bring; and the type of freight within each account. Larson also asked Schaap to include, based on Schaap's comfort level, any "existing accounts" Schaap would target and timelines for those accounts; approximate weekly yield those accounts would bring; and Schaap's plan for seeking new business. Larson closed the e-mail with the following:

> I felt like we completely [sic] on the same page, but just wanted to reiterate that [Kaplan] definitely understands your desire to seek new business and potentially not even target existing accounts. [Kaplan] gets the fact that you would be limiting your risk and just the opportunity for different customers and more customers is GREATER within our group. With meeting you, [Kaplan] also sees the experience, knowledge, enthusiasm and ideas that you bring. [Kaplan] does need to be able to explain to his boss the business that does exist and have an understanding of your timelines to target that business (based on your comfort level) in order to be able to illustrate the value that you would bring to the organization as well as to help support the salary request during his discussion with his boss this week.

{¶59} At her deposition, Larson indicated the "target accounts" referenced in her e-mail included "whatever [Schaap] told [her] they would include." While Larson testified she was not expecting Schaap to bring any customers over from TQL, she admitted her use of the term "existing accounts" meant Schaap's accounts with TQL. Larson further testified Alliance was interested in what margins his existing accounts at TQL bring, "not necessarily the ones that he was bringing over." Larson indicated she wanted to get a "feel" for his accounts at the time, not that he should or should not bring any accounts from TQL to Alliance.

{¶60} Schaap responded on March 29 with a detailed business plan. The business

plan initially stated that, "at first, there will be customers that [he has] strong relationships with that [he] will carry over right away to put some freight on the board and keep [him] from turning zeroes in the initial weeks while [he's] out building new relationships with new prospects." Schaap then identified six of his current TQL customers and their approximate weekly yields. Although Schaap specifically identified six of his current customers at TQL, Larson testified she did not necessarily believe Schaap intended to continue moving freight for those customers when he came to Alliance.

{¶61} Two days later, on March 31, Schaap e-mailed Larson a copy of another TQL employee's noncompete agreement. At her deposition, Larson indicated she did not read the sample noncompete agreement, but forwarded the agreement to, and discussed the agreement with, Kaplan.

### iv. Ryan Schaap's Testimony

{¶62} Schaap also testified at trial regarding his recruitment to Alliance. According to Schaap, Larson saw his profile online and reached out regarding a new opportunity. Upon responding, Schaap immediately disclosed to Larson that he was subject to the NCA. According to Schaap, the NCA prohibited him from working for a direct competitor and targeting or soliciting his customers from TQL. Larson informed Schaap that the NCA was not an issue for Alliance, however, Schaap remained concerned. Schaap testified he asked Larson, "How [is Alliance] not a direct competitor [with TQL]?" At that point, Larson detailed how the companies are different, which led Schaap to believe Alliance was not a direct competitor of TQL and that he was complying with his NCA. Schaap further testified that, after the temporary restraining order was issued against him in late June 2017, he became nervous about the litigation pending against him, and discussed the NCA with Horowitz, Alliance's general counsel. At that time, Horowitz informed Schaap that Alliance and TQL were not competitors, and reiterated to Schaap that his employment at Alliance would not

be a problem.

{¶63} Although Schaap initially testified he did not consider TQL and Alliance competitors, he later testified he believed there was overlap with Alliance and TQL's businesses, and admitted the two were competitors. Schaap further confirmed that, while Alliance offered positions that were not brokering in spot freight, he was hired to do, and was doing, the same job at Alliance that he was doing at TQL.

{¶64} Schaap then discussed the business plan he prepared for Larson and Kaplan. Schaap testified the business plan he prepared was simply a "game plan" to give Alliance an idea of his skillset. According to Schaap, he had already established with Larson that he was not comfortable targeting his customers from TQL and Larson respected that idea. Thus, it was not Schaap's intention to take the TQL customers identified in his business plan to Alliance.

{¶65} With regard to CFS and JLE, Schaap confirmed they were his customers at TQL until he left for Alliance. While at Alliance, Schaap indicated he did not intend to "bother with old customers;" however, CFS and JLE contacted him regarding moving a load and Schaap simply could not "avoid" them. According to Schaap, while he did not want to work with CFS or JLE, the companies needed help moving loads and Schaap helped them do that. Schaap testified he did not believe his actions constituted "soliciting" or "targeting" customers in violation of the NCA because CFS and JLE contacted Schaap directly.

{¶66} On cross-examination, Schaap admitted to telling numerous lies to Larson regarding his intention to bring TQL customers to Alliance, as well as exaggerating his career's success at TQL. For example, Schaap testified that his e-mail to Larson that stated he was "worried about the challenges [his NCA] might bring," and that he assumed asking for a higher base salary "would mean that [he] should bring [his] current customers" from TQL with him to Alliance to add value, was "definitely not the truth." Rather, according to

Schaap, he and Larson had come to an understanding that he would not be bringing customers to Alliance from TQL.

{¶67} Schaap also testified he was dishonest in his proposed business plan, and that certain statements, including his assertion that "there will be customers that [he] ha[d] strong relationships with, that [he would] carry over right away," were also lies.

{¶68} Schaap further discussed his business plan, and indicated he intended to get business from companies, such as steel companies, that he could not get credit for while at TQL due to other brokers. Schaap was aware that those companies brokered freight for TQL; however, Schaap denied he would be adding companies to Alliance solely from his previous employment at TQL. Rather, Schaap indicated he had independent access to lists of companies with loads to move.

{¶69} Schaap also testified regarding the May 20, 2017 e-mail to Larson and Kaplan, which described TQL's discovery of his employment with Alliance. According to Schaap, at the time TQL discovered his employment with Alliance, he believed he was in compliance with his NCA. After sending the May 20, 2017 e-mail, Schaap admitted he continued moving loads for at least one former TQL customer until Kaplan told him not to solicit his former customers. According to Schaap, the first time Kaplan told Schaap not to solicit his former TQL customers was around July 10, 2017. Schaap indicated an earlier discussion on the topic was unneeded, because "there was an understanding between [Larson] and [Schaap] * * * that * * * they felt comfortable and they respected [Schaap's] decision not to target other clients of TQL."

## B. Waiver

{¶70} Alliance first contends TQL has waived any alleged error related to the trial court's purported failure to weigh the *Siegel* factors, as TQL failed to specifically raise the *Siegel* factors at trial or in its proposed findings of fact and conclusions of law. Alliance

cites *Pottmeyer v. Douglas*, 4th Dist. Washington No. 10CA7, 2010-Ohio-5293, in support of its position. *See Pottmeyer* at ¶ 4 (appellant waived argument for purposes of appeal where she failed to properly raise the argument at trial, or in her proposed findings of fact and conclusions of law post trial).

{¶71} After a review of the record, we find TQL sufficiently raised the issue of justification, and therefore, the *Siegel* factors, in the trial court. Specifically, in its pleadings leading up to trial, as well as in its post-trial proposed findings of fact and conclusions of law, TQL consistently maintained that Alliance's interference with the NCA was not justified and was improper. The Ohio Supreme Court has indicated the *Siegel* factors are to be used when determining whether a defendant's interference is improper, and TQL cited cases in its pleadings which discussed the *Siegel* factors and their application. See *Siegel*, 85 Ohio St.3d at 176. Additionally, TQL specifically set forth and discussed the *Siegel* factors in its summary judgment briefing and reincorporated those arguments in its pretrial brief as part of the law applicable to this case. Although TQL did not specifically reference each factor at trial or in its proposed findings of fact and conclusions of law, we find TQL's consistent reference to Alliance's improper interference, its prior references to *Siegel*, and its reincorporation of its summary judgment arguments at trial, as sufficient to preserve the issue for appeal in this circumstance.

{¶72} As a result, we conclude TQL has not waived the alleged error that the trial court failed to properly weigh the *Siegel* factors when determining Alliance's interference with the NCA was not improper.

## C. Standard of Review

{¶73} Next, Alliance contends we should employ a manifest-weight standard to evaluate whether the trial court erred when it determined Alliance did not tortiously interfere with Schaap's NCA with TQL. Under this standard, Alliance argues we should construe

TQL's argument as a contest to the trial court's weighing of the credibility of the testimony and evidence and conclude the trial court's decision that Alliance acted in good faith is supported by competent and credible evidence in the record. TQL, on the other hand, argues we should employ a de novo standard of review, as the trial court incorrectly applied the law to the facts, and therefore, the trial court's judgment is in error as a matter of law.

{¶74} After a review of the record in the instant matter, we agree with Alliance that the trial court's decision, which followed a bench trial, is subject to a manifest weight of the evidence standard of review. As an initial note, based upon the trial court's citation to *PNH, Inc. v. Alfa Laval Flow, Inc.*, 130 Ohio St.3d 278, 2011-Ohio-4398, ¶ 40, which references *Siegel* and its factors, as well as the trial court's discussion of Alliance's good-faith conduct, we cannot say the trial court did not consider the *Sigel* factors before making its decision. Rather, there is at least some evidence in the record that the trial court considered the factors, despite failing to expressly note the factors in its decision. *See Buckeye Retirement Co., L.L.C., Ltd. v. Busch*, 2d Dist. Greene No. 2016-CA-32, 2017-Ohio-4009, ¶ 88 (finding the trial court sufficiently addressed the *Siegel* factors where it concluded the defendant acted without malice, professionally, and in good faith and cited cases which discussed other factors).

{¶75} Thus, on appeal we must determine whether competent and credible evidence exists within the record to support the trial court's determination that Alliance's interference with Schaap's NCA was not improper, but was justified. *Brookeside Ambulance v. Walker Ambulance Serv.*, 112 Ohio App. 3d 150, 157 (6th Dist.1996) ("whether [the defendant's] actions were 'improper' is a question for the trier of fact to determine after it balances the factors set forth in Section 767 of the Restatement").

{¶76} This is consistent with the standard employed by other Ohio courts, which have considered similar issues on appeal. *See Union Sq. Realty, Inc. v. Golfers & Hackers,*

*Inc.*, 5th Dist. Stark No. 2010 CA 00005, 2011-Ohio-1882, ¶ 74-83 (where the appellate court employed a manifest weight of the evidence standard of review where the trial court determined the defendant's interference was improper, but did not explicitly address each of the *Siegel* factors, and the appellant challenged the trial court's judgment on appeal); *Thompson Thrift Constr. v. Lynn*, 5th Dist. Delaware No. 16 CAE 10 0044, 2017-Ohio-1530, ¶ 109 (employing a manifest weight of the evidence standard of review when addressing appellant's challenge to the appellee's tortious interference claim); *see also MNM & MAK Ents., L.L.C. v. HIIT FIT Club, L.L.C.*, 10th Dist. Franklin No. 18AP-980, 2019-Ohio-4017, ¶ 26 (where appellant claimed the trial court failed to consider the requisite factors prior to determining its list did not constitute a trade secret, and the trial court indicated "the relevant inquiry is whether the trial court's determination * * * is supported by competent, credible evidence").

### D.  Manifest Weight of the Evidence Analysis

{¶77}  Typically, when reviewing civil appeals from bench trials, an appellate court applies a manifest weight standard of review.  *Revilo Tyluka, L.L.C. v. Simon Roofing & Sheet Metal Corp.*, 193 Ohio App.3d 535, 2011-Ohio-1922, ¶ 5 (8th Dist.), citing App.R. 12(C); *Seasons Coal v. Cleveland*, 10 Ohio St.3d 77 (1984).  In a manifest weight analysis, the reviewing court weighs the evidence and all reasonable inferences, considers the credibility of witnesses and determines whether, in resolving conflicts in the evidence, the finder of fact clearly lost its way and created such a manifest miscarriage of justice that the judgment must be reversed. *Chasteen v. Dix Road Property Mgt., L.L.C.*, 12th Dist. Butler Nos. CA2020-04-055 and CA2020-04-056, 2021-Ohio-463; *Holmes v. Grove*, 12th Dist. Butler No. CA2016-04-075, 2017-Ohio-55, ¶ 28.  In reviewing a bench trial, an appellate court will uphold the trial court's determination unless it appears that the record is such that no reasonable person could have concluded as the trial court did.  *Garringer v. Gen. Motors*

*Acceptance Corp.,* 12th Dist. Fayette No. CA92-06-011, 1992 Ohio App. LEXIS 6313, *2 (Dec. 14, 1992).

{¶78} Tortious interference with contract occurs "when a person, without a privilege to do so, induces or otherwise purposely causes a third person * * * not to perform a contract with another." *A & B-Abell Elevator Co. v. Columbus/Cent. Ohio Bldg. & Constr. Trades Council*, 73 Ohio St.3d 1, 14 (1995). The elements of the tort include 1) the existence of a contract, 2) the wrongdoer's knowledge of a contract, 3) the wrongdoer's intentional procurement of the contract's breach, 4) the lack of justification, and 5) the resulting damages from that breach. *Knox Mach., Inc. v. Doosan Mach., USA, Inc.*, 12th Dist. Warren No. CA2002-03-033, 2002-Ohio-5147, ¶ 21. "In order to prevail, a party must demonstrate that the wrongdoer '"intentionally and improperly"' interfered with its contractual relations with another." *Easterling v. Arnold*, 12th Dist. Butler No. CA2011-06-108, 2012-Ohio-429, ¶ 13, citing *Becker Equip., Inc., v. Flynn*, 12th Dist. No. CA2002-12-313, 2004-Ohio-1190, ¶ 15.

{¶79} As noted above, TQL argues that the trial court erred in determining it had not carried its burden in proving the fourth element, the lack of justification. Establishment of the fourth element of the tort of tortious interference with contract, lack of justification, requires proof that the defendant's interference with another's contract was improper. *Siegel*, 85 Ohio St.3d at 176. "The Ohio Supreme Court has adopted "Section 767 of the Restatement, which provides guidelines to be followed in determining whether an actor's interference with another's contract is improper." *Id.* at 178. "The issue in each case is whether the interference is improper or not under the circumstances, [and] whether * * * the conduct should be permitted without liability, despite its effect of harm to another." *Id.* at 176. Accordingly, a court determining whether an actor's interference with a contract was improper or "privileged" should consider the following factors:

the nature of the actor's conduct, (b) the actor's motive, (c) the interests of the other with which the actor's conduct interferes, (d) the interests sought to be advanced by the actor, (e) the social interests in protecting the freedom of action of the actor and the contractual interests of the other, (f) the proximity or remoteness of the actor's conduct to the interference, and (g) the relations between the parties.

*Id.* at 176, 178 (even if an actor's interference with another's contract causes damages to be suffered, the interference does not constitute a tort if the interference is justified).

{¶80} Here, as discussed above, the trial court found that TQL failed to prove the fourth element because Alliance had a "good-faith" belief that the NCA was unenforceable. Specifically, the trial court found the terms "Competing Business" and "Customer" as defined by the NCA are overbroad. The trial court further found that "there is little doubt that if Illinois law applies, the NCA is not enforceable[.]" Thus, when considering the overbroad terms of the NCA, coupled with the unenforceability of the NCA if Illinois law applied, the trial court found Alliance's belief that the NCA was not enforceable was reasonable and that it had not acted improperly in interfering with the NCA. As a result, the trial court concluded that because Alliance did not act improperly, TQL had failed to prove Alliance's interference lacked justification.

{¶81} As an initial note, although the *Siegel* factors do not discuss "good faith," the trial court's discussion regarding Alliance's good-faith belief that the NCA was unenforceable relates to the first and second of the *Siegel* factors, the nature of the actor's conduct and the actor's motive. See Restatement of the Law 2d Torts, Section 767, Comment c (1979) (indicating a person may be liable for other torts, without being liable for intentional interference because of his good faith conduct.). Despite its consideration of these *Siegel* factors, we find the trial court's determination that Alliance acted in "good faith" is not supported by competent and credible evidence. Rather, the record reflects Alliance knowingly refused to acknowledge or learn the terms of Schaap's NCA prior to interfering

- 28 -

with the agreement.  Because the terms of the agreement were unknown to Alliance at the time of Schaap's breach, Alliance could not have formed a good-faith belief regarding the agreement's enforceability before it hired Schaap and encouraged the solicitation of business from his former TQL customers, JLE and CFS.  Consequently, and based upon the knowledge Alliance had at the time of Schaap's solicitation of business from JLE and CFS, we find Alliance was not justified in tortiously interfering with Shaap's NCA.

{¶82}  With regard to the knowledge Alliance maintained at the time of Schaap's breach, the record indicates Alliance became aware of TQL's use of noncompete and non-solicitation agreements by January 2017.  At that time, Larson specifically inquired about Martain's noncompete situation because he "worked at TQL."  Martain then responded by informing Larson that his noncompete with TQL indicated he could not pursue or solicit any of the customers he worked with while at TQL for one year.  Larson would have informed Kaplan, the vice president of ACC and the person responsible for enforcing Martain's noncompete agreement, that the agreement existed. This exchange demonstrates that Alliance, through Larson and Kaplan specifically, was aware that former TQL employees were generally subject to restrictive agreements and covenants after leaving TQL.  This exchange also evidences that Larson and Kaplan were aware that one of those restrictive covenants prohibited former TQL employees from "soliciting or pursuing" TQL customers for a period of one year.

{¶83}  One month later, Schaap also informed Larson that he had a noncompete agreement with TQL that could restrict him from taking certain positions with Alliance.  The record indicates Larson and Schaap engaged in several discussions regarding his NCA with TQL and his ability to bring former customers to Alliance.  Ultimately, Schaap expressed hesitation to Larson and Kaplan regarding bringing TQL customers to Alliance right away, and Larson and Kaplan urged Schaap to bring over his existing accounts to the

extent he felt "comfortable." While Larson and Kaplan both testified they were not "expecting" Schaap to bring his existing TQL customers to Alliance, they repeatedly indicated he could bring such customers over, to the extent he was comfortable, and openly discussed Schaap's current clients at TQL, the margins those customers were bringing in per week, and Schaap's "strong book of business." While Alliance ultimately left it up to Schaap to determine his comfortability with bringing his existing clients to Alliance, the record is clear that Kaplan, who was responsible for enforcing Schaap's NCA, did not instruct Schaap not to solicit or pursue TQL customers after joining Alliance, or that such pursuit or solicitation was even improper, until July 2017.

{¶84} A few days before Schaap began his employment at Alliance, Schaap e-mailed Larson a copy of a TQL noncompete agreement. That e-mail stated the following:

> Here is the noncompete. Sorry it's not the one [I] signed. Consider [sic] the situation right now, this is the best [I] could come up with without alerting certain people in the office to [my] situation. It looks like it was a longer document before as well.

{¶85} Although the noncompete agreement Schaap forwarded was not his own, and was apparently an abbreviated version, the agreement contains substantially similar language to the nonsolicitation and noncompete covenants found in his NCA. Despite receiving a copy of a noncompete agreement used by TQL, which it appears Schaap sent at Larson's request, no one from Alliance read the agreement. According to Kaplan, he did not read Schaap's NCA until after this litigation was initiated against Schaap in late June. Thus, until that point, Kaplan was unaware of the specific terms of the NCA, but was generally aware of the activity the NCA restricted via information passed from Martain and Schaap to Larson, who then passed along the information to Kaplan. That information included that Schaap could not solicit or pursue his former TQL customers for a period of one year after leaving TQL.

{¶86} Moreover, by May 20, 2017, when Schaap disclosed to Kaplan and Larson that TQL was aware he was working for Alliance and that he had brokered deals for two former TQL customers, Kaplan knew several key facts related to the restrictions imposed on Schaap. Specifically, Kaplan knew Martain had been sued for breaching his noncompete agreement with TQL and Alliance had been sued for intentionally interfering with that noncompete agreement; that TQL's noncompete agreement prohibited former employee's from soliciting TQL's customers for a period of one year; that Schaap was doing business with at least two former TQL customers; and that Alliance requires its employees to sign a noncompete agreement with a nonsolicitation covenant. Despite this knowledge, Kaplan indicated he did not know until July 2017 that he should instruct Schaap not to solicit his former TQL customers. Notably, by July 2017, Kaplan had already received guidance regarding the lawsuit pending against Martain, who worked at TQL at the same time as Schaap and was subject to a similar noncompete and nonsolicitation agreement with TQL.

{¶87} Despite the overwhelming evidence that Alliance was aware of the NCA and its restrictions on Schaap's ability to solicit his former TQL customers, and evidence that Alliance induced Schaap into breaching his NCA, the trial court found Alliance's interference with the NCA was justified. This finding was based upon the trial court's determination that Alliance's belief that the NCA's terms were overbroad and that it was unenforceable in Illinois was reasonable. However, because Alliance deliberately avoided learning the terms of the NCA, we find Alliance could not reasonably have formed a good faith belief regarding the enforceability of NCA by the time of Schaap's breach.

{¶88} Furthermore, the record reflects Alliance's general counsel did not advise Alliance that the entire NCA was unenforceable or overbroad. Rather, Alliance's counsel advised that while the noncompete portion of the NCA was unenforceable, Alliance should

be concerned about the nonsolicitation portion of Schaap's NCA. Alliance offered no evidence at trial that Kaplan, Larson, or any other individual at Alliance believed the non-solicitation portion of the agreement was unenforceable. Thus, based upon the guidance from counsel, and Schaap's and Martain's disclosures regarding the nonsolicitation restriction within the agreement, Alliance should have been aware that Schaap could not solicit his former customers from TQL without violating the NCA.

{¶89} Additionally, the record reflects Kaplan received this advice from counsel at some point after May 20, 2017 and before July 10, 2017. Prior to May 20, 2017, neither Kaplan nor Alliance's legal counsel had reviewed Schaap's NCA and no one from Alliance read the substantially similar noncompete agreement provided by Schaap. Consequently, during Schaap's recruitment and employment before May 20, 2017, no one at Alliance had sufficient knowledge of the NCA's terms in order to develop a good-faith belief that those terms were overbroad and unenforceable pursuant to Illinois law. Moreover, by the time Schaap's NCA was reviewed and Kaplan was advised to instruct Schaap to stop pursuing his former TQL customers, several transactions with JLE and CFS had already occurred, and Alliance had already interfered with the NCA.

{¶90} We are also unpersuaded that Alliance was unaware the NCA would be enforceable because Alliance does not typically enforce its own noncompete agreements against employees who worked at the company for less than two years and has not initiated litigation against any employees to enforce their noncompete agreement. While this may be true, the record reflects Alliance is familiar with noncompete agreements, that a majority of those agreements restrict both the employment with a competitor and the solicitation of the employee's former customers, and that Alliance has all employees, including Schaap, sign a noncompete agreement with similar nonsolicitation restrictions to the NCA prior to starting at Alliance. Furthermore, Alliance's noncompete agreement includes a choice of

law provision which indicates the agreement is governed by the laws of New Jersey. Thus, Alliance should have been familiar with noncompete agreements that, although signed and executed in Illinois, could be subject to another state's interpretation of the agreement's enforceability.

{¶91} In accordance with the above, we find there is no evidence that suggests Alliance's belief that the NCA, in its entirety, was unenforceable, was reasonable or in good faith. Rather, in light of the significant testimony and evidence discussed above, we find Alliance's belief that the NCA was unenforceable was unreasonable given its decision to knowingly and intentionally ignore the terms of Schaap's NCA. As a result, we find no reasonable person could have concluded as the trial court did in this matter. That is, because the evidence presented at trial indicates Alliance was aware of the existence of the NCA, but not of its specific terms, we find Alliance could not have formed a good-faith belief regarding the enforceability of those terms prior to the time Schaap solicited his former customers from TQL, and before Alliance interfered with Schaap's NCA with TQL.

{¶92} Accordingly, because there is no competent and credible evidence in the record to support the trial court's decision, we find the trial court's decision is against the manifest weight of the evidence. Therefore, we sustain TQL's assignment of error.

### III. Analysis of the Factors

{¶93} Having determined the trial court's decision regarding the fourth element, that Alliance's interference was justified, is against the manifest weight of the evidence, we exercise the authority granted in App.R. 12(C)(1) to weigh the evidence in the record, apply the *Siegel* factors, and render a judgment that the trial court should have rendered. App.R. 12(C)(1).

### A. The Nature of the Actor's Conduct

{¶94} With regard to the first factor, the nature of Alliance's conduct, we find this

- 33 -

factor weighs in favor of finding that Alliance acted improperly in interfering with the NCA. The tort of interference with a contract includes interference with an existing contract by causing a third party not to perform his contract with the plaintiff. *Siegel*, 85 Ohio St. 3d at 176. The comments to Section 767 of the Restatement of the Law 2d Torts indicate the nature of the actor's conduct is a chief factor in determining whether the conduct is improper or not. "The issue is not simply whether the actor is justified in causing the harm, but rather whether he is justified in causing it in the manner in which he does cause it." Restatement of the Law 2d Torts, Section 767, Comment c (1979).

{¶95} As discussed at length above, Alliance hired Schaap to work in its ACC division due to his experience in the spot-freight market and his purported success in that industry while at TQL. The record reflects Alliance created the ACC division shortly before hiring Schaap and was eager to recruit experienced brokers to work in that division. Thus, Alliance intentionally interfered with the NCA by hiring Schaap, despite knowing of the NCA, and encouraging and allowing him to solicit business from his former TQL customers. While Kaplan testified Alliance was not "interested" in Schaap's former clients at TQL, Schaap, Larson, and Kaplan had several conversations regarding Schaap's comfort level with bringing his former clients to Alliance. This includes Schaap's ability to negotiate a higher starting salary based, in part, on his potential to bring new customers to Alliance immediately. Alliance also found it noteworthy that Schaap had a "strong book of business" that he could bring to Alliance without trouble.

{¶96} The record also reflects Schaap, Larson, and Kaplan had several discussions regarding the NCA, and the restrictions Schaap was subjected to for one year. Thus, although Alliance did not know the precise terms of the NCA until June 2017, Kaplan was aware the agreement prohibited Schaap from pursuing his former customers from TQL for a period of one year. Regardless of the definition of "customer" in the NCA, such a

restriction would clearly include customers like JLE and CFS, which Schaap directly brokered loads for while at TQL.  Kaplan was aware of this impediment, as he, Schaap, and Larson discussed that Alliance understood and respected Schaap's uneasiness with pursuing former TQL customers while at Alliance.  Notwithstanding Kaplan's knowledge, he and Larson encouraged Schaap to target those accounts to the extent he was "comfortable" in doing so.

{¶97}  Despite becoming aware of Schaap's solicitation of JLE and CFS in May 2017, Alliance contends it did not know how to handle Schaap's NCA at that time.  As a result, Alliance did not instruct Schaap not to solicit his former TQL customers until July 10, 2017, approximately three months after Schaap provided Alliance with a substantially similar noncompete agreement, approximately two months after Schaap began brokering loads for JLE and CFS on behalf of Alliance, and approximately one month after Schaap told Kaplan he had brokered those loads.  At trial, Kaplan indicated he did not instruct Schaap not to solicit business from his former TQL clients sooner than July 2017 for two reasons: First, based upon the May 20, 2017 e-mail, Kaplan believed Schaap was no longer targeting his former customers.  Second, Kaplan was waiting for guidance from Alliance's legal counsel regarding Schaap's NCA.  We find Kaplan's reasoning unpersuasive, as a review of the e-mail reveals Schaap did not discuss his intention to cease working with either CFS or JLE as a result of TQL's discovery, but merely confirmed those two customers would never inform TQL of their transactions.

{¶98}  Furthermore, given the similarity between the situation with Martain and Schaap, i.e., they were both employed by TQL at the same time, they both were subject to a noncompete agreement, and they both were recruited by Larson to work for Alliance's ACC division in early 2017, Kaplan should have been on notice that Schaap's activity was in breach of the NCA.

{¶99} While Alliance argues its conduct does not evidence an intent to cause a breach of contract, we disagree. As this court has previously noted, "[t]o establish the intent element of a tortious interference with contract claim, a plaintiff must either (1) prove that the defendant acted with the purpose or desire to interfere with the performance of the contract or (2) prove that the defendant knew that *interference was certain or substantially certain to occur as a result of its actions*." (Emphasis added.) *Ginn v. Stonecreek Dental Care*, 12th Dist. Fayette No. CA2014-06-015, 2015-Ohio-1600, ¶ 17. Here, the record reflects Alliance knew that interference with the NCA was substantially certain to occur as a result of its actions. Specifically, despite knowing the NCA existed, Alliance encouraged and induced Schaap to pursue former TQL customers and did not tell Schaap to cease such activity after learning he was, in fact, soliciting business from former TQL customers on Alliance's behalf. Thus, based upon the degree of knowledge Alliance had in the instant matter, coupled with its deliberate attempt to ignore the terms of the NCA, we find its conduct sufficiently satisfies the intent element of the tort.

{¶100} In light of the above facts, we find Alliance deliberately and intentionally ignored the terms of the NCA and elected to allow Schaap to violate the NCA based upon its unfounded belief that the agreement would not be enforceable. As discussed above, such a belief was not reasonable under the circumstances. Based upon this conduct, we find the first factor weighs heavily in favor of improper interference with the NCA.

**B. The Actor's Motive and The Interests Sought to be Advanced by the Actor**

{¶101} With regard to the second and fourth factors, we find they also weigh in favor of finding Alliance's interference with the NCA was improper. According to Comment d of Section 767, the factor of motive concerns whether the actor desired to bring about the interference as the sole or a partial reason for his conduct. "If there is no desire at all to accomplish the interference and it is brought about only as a necessary consequence of

the conduct of the actor engaged in for an entirely different purpose, his knowledge of this makes the interference intentional, but the factor of motive carries little weight toward producing a determination that the interference was improper." Restatement of the Law 2d Torts, Section 767, Comment d (1979).

{¶102} Motive is oftentimes difficult to separate from the other factors, and there is a "very intimate" relation between an actor's motive and the interests that the actor is trying to promote by his conduct. *Id.* Given this close relationship, the two factors can be merged into one. *Id.* The factor of the actor's interest concerns the individual and social value or significance of any interests that he is seeking to promote. *Id.* An economic interest is designated as "important" by the Restatement and will ordinarily prevail over a similar interest if the actor does not use wrongful means. *Id.* However, if the interest of the other has been consolidated into the binding legal obligation of a contract, that interest will normally outweigh the actor's own interest in taking that established right from him. *Id.* at Comment f.

{¶103} Here, the record indicates Alliance's motive in interfering with the NCA was economical. Specifically, Alliance sought to economically benefit from Schaap's former employment with TQL by hiring Schaap and potentially acquiring his former business from TQL sooner than one year after Schaap left TQL. Furthermore, Alliance created the ACC division with a specific intent to compete in the spot-freight market and sought to hire experienced brokers with existing knowledge of the spot-freight market to grow that group.

{¶104} TQL's interest in enforcing the NCA is also economic, as it seeks to prohibit the unfair competition that could result from its former employees using the knowledge and expertise gained as a result of their employment at TQL.

{¶105} Using the comments as guidance, TQL's economic interest outweighs Alliance's economic interest in the instant case, as the NCA is a binding contract, and

Alliance's motive in interfering with that contract was, in part, to take that established right from TQL. Such a motive is evident where Alliance specifically sought to hire candidates, like Schaap, with logistics experience in the spot-freight market for its ACC division, and encouraged him to bring his former TQL customers to Alliance for its own financial gain. While Alliance's interference with the NCA was not accomplished by threat or force, it intentionally disregarded the NCA's terms in the interest of profiting from Schaap's prior employment with TQL. This interest is outweighed by TQL's contractual interest in restricting Schaap's future employment for one year after his separation from TQL. As a result, we conclude the second and fourth factors weigh in favor of finding Alliance's interference was improper.

### C. The Interests of the Other

{¶106} According to the comments to the restatement, some contractual interests receive greater protection than others. Restatement of the Law 2d Torts, Section 767, Comment e (1979). Thus, this factor distinguishes between the actor's inducement or persuasion of a third party to commit a breach of an existing contract with the other versus interfering with the other's prospective contractual relations with the third party. *Id.*

{¶107} Here, it is undisputed that the NCA is an enforceable contract that prohibits Schaap from working for a competing business, like Alliance, and from soliciting his former TQL customers for a period of one year. The trial court found the restrictions in the NCA are reasonably tailored to protect the legitimate business interest of TQL. That interest includes limiting unfair competition after training Schaap and providing him with access to TQL's confidential information. The NCA operates to prevent employees from using the knowledge and information gained at TQL for the benefit of a competitor for a period of one year.

{¶108} When considering the legitimate business interest of TQL in this instance, we

find this factor weighs in favor of finding Alliance's interference was improper. As noted by the trial court, such noncompete agreements are commonplace in the logistics field, and due to the competitive nature of the industry, such agreements are vital in protecting the interests of companies, like TQL, who elect to hire and extensively train new employees with no prior experience in the field. Thus, we find TQL had a legitimate interest in restricting Schaap from immediately transitioning to Alliance and providing Alliance with an unfair advantage as TQL's competitor.

### D. The Social Interests

{¶109} After a review of the record, we find the fifth factor also weighs in favor of finding Alliance's interference was improper. Comment g to Section 766 indicates the social interest in competition would be unduly prejudiced if one were to be prohibited from in any manner persuading a competitor's prospective customers not to deal with him. Restatement of the Law 2d Torts, Section 767, Comment g (1979). Thus, the issue here is whether the social interest in allowing the freedom of businesses to compete is sufficient to outweigh the harm that Alliance's conduct is designed to produce. Restatement of the Law 2d Torts, Section 766, Comment c (1979). In deciding this issue, the nature of Alliance's conduct is an important factor. *Id.*

{¶110} While the competition between competitors is an important social interest, Alliance's interference in this matter, if allowed, promotes unfair competition between competitors. Despite its awareness of Schaap's NCA, Alliance elected to disregard the terms of the NCA and allowed Schaap to solicit his former TQL customers while at Alliance. Additionally, Alliance blindly followed the advice of its legal counsel, notwithstanding TQL's lawsuit against Martain and the concerns expressed by Schaap related to his employment in the ACC division and his pursuit of former TQL customers. The danger of allowing Alliance to engage in such behavior outweighs society's interest in fair competition between

competitors. That is, allowing Alliance to avoid liability for its actions in the instant matter would incentivize companies to intentionally ignore the provisions of an employee's noncompete agreement with the hope that defenses will be available to shield it from liability. As a result, we find this factor also weighs in favor of finding Alliance's interference is improper.

### E. The Proximity or Remoteness of the Actor's Conduct to the Interference

{¶111} According to the Restatement, one who induces a third person not to perform his contract with another interferes directly with the other's contractual relation. Restatement of the Law 2d Torts, Section 767, Comment h (1979). Whether the interference is an immediate consequence of the conduct is important to the determination of whether the actor's interference was improper. *Id.* Mere knowledge that this consequence is substantially certain to result may be sufficient. *Id.*

{¶112} Here, Alliance's interference is an immediate consequence of its conduct. Specifically, Alliance's decision to encourage Schaap to pursue former TQL customers, and declining to instruct Schaap to cease such activity after learning he was soliciting business from TQL customers, directly resulted in the breach of Schaap's NCA. While Kaplan indicated he believed Schaap ceased the prohibited activity in May 2017, the record reflects Schaap did not cease soliciting business from JLE and CFS until Kaplan instructed him not to do so. This includes Schaap continuing to broker deals for JLE while subject to the temporary restraining order, which ordered him to comply with the NCA. As a result, it is reasonable to believe Schaap would have ceased the prohibited activity sooner if Kaplan instructed him to do so. As such, we find the interference was a direct result of Alliance's deliberate inaction, as well as its approval and encouragement of Schaap's immediate pursuit of his former TQL customers. Accordingly, we find this factor weighs in favor of finding Alliance's interference was improper.

**F. The Relations between the Parties**

{¶113} The relations between the parties is considered an important factor in determining whether an interference is proper or improper. Restatement of the Law 2d Torts, Section 767, Comment g (1979). The comments specifically note that in instances where the interference occurs between competitors, such interference may be proper where it otherwise would not be. *Id.* However, the comments also distinguish between interference in a prospective contract, an existing contract, or a contract terminable at will.[1] *Id.* Here, the trial court found that Alliance and TQL are competitors, which is supported by the testimony at trial that the ACC division and TQL both focused in the spot-freight market and have some overlap in their operations. However, despite the allowance of fair competition between the competitors, Alliance's intentional interference with the NCA, an existing and fully enforceable contract, promotes unfair competition between the parties. Specifically, as discussed above, allowing Alliance to interfere with the NCA, despite knowing of the NCA's existence, would incentivize companies to ignore its employees' noncompete agreements. Moreover, deeming such interference proper in light of the competition between the parties would allow companies like Alliance to escape liability despite disregarding noncompete agreements based upon flawed reasoning.

{¶114} After considering the above factors, we find the factors weigh in favor of a determination that Alliance's interference with the NCA was improper, and was without justification. It has been suggested that "the real question is whether the actor's conduct was fair and reasonable under the circumstances." Restatement of the Law 2d Torts, Section 767, Comment j (1979). In light of the foregoing facts and analysis, we decline to

---

1. We note that although the Ohio Supreme Court has held the establishment of the privilege of fair competition can defeat a claim of tortious interference, the privilege does not exist here, where the contract at issue is a noncompete agreement, as opposed to an at-will employment agreement. *Siegel,* 85 Ohio St.3d 171 at 180.

find that Alliance's conduct was fair and reasonable under the circumstances. Rather, Alliance remained deliberately ignorant of the enforceability of the NCA and encouraged Schaap to breach the NCA to the extent he was "comfortable." Given the nature of the logistics industry, the fact that noncompete agreements are common in that industry, and Alliance's own use of such agreements, Alliance was substantially certain that employing Schaap and allowing Schaap to solicit former TQL customers was a breach of the NCA.

## IV. Conclusion

{¶115} Accordingly, finding that TQL proved each and every element of its tortious interference with a contract claim against Alliance, we reverse the trial court's decision, and enter judgment in favor of TQL on that claim. We remand the case to the trial court to determine the applicable damages resulting from the tortious interference claim.

{¶116} Judgment reversed and remanded.

PIPER, P.J., and M. POWELL, J., concur.